SOUTHWESTERN PUBLIC SERVICE
COMPANY, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Full Requirements Cooperative Customers of Southwestern Public Service Company, City of Brownfield, Texas, City of Floydada, Texas, and Lea County Electric Cooperative, Inc., Intervenors.

SOUTHWESTERN PUBLIC SERVICE
COMPANY, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Golden Spread Electric Cooperative, Inc., Kimwood Electric Cooperative, Inc., the Full Requirements Cooperative Customers of Southwestern Public Service Company, Lubbock Power & Light of the City of Lubbock, Texas and the Cities of Brownfield, Floydada and Tulia, Texas, Intervenors.

SOUTHWESTERN PUBLIC SERVICE
COMPANY, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Golden Spread Electric Cooperative, Inc., Kimwood Electric Cooperative, Inc., and the Full Requirements Cooperative Customers of Southwestern Public Service Company, Intervenors.

Nos. 83–1759, 85–1421 and 85–2117.

United States Court of Appeals,
Tenth Circuit.

March 24, 1988.
Rehearing Denied May 27, 1988.

Paul J. Kelly, Jr. of Hinkle, Cox, Eaton, Coffield & Hensley, Santa Fe, N.M. (Paul W. Eaton of Hinkle, Cox, Eaton, Coffield & Hensley, Amarillo, Tex., Alan J. Statman and Michael E. Small of Wright & Talisman, P.C., Washington, D.C, with him on the briefs), for petitioner.

A. Karen Hill, F.E.R.C. (William H. Satterfield, General Counsel, Stephen R. Melton, Acting General Counsel, Barbara J. Weller, Deputy Sol., with her on the briefs), Washington, D.C., for respondent.

Robert A. O'Neil of Miller, Balis & O'Neil, P.C. (James R. Choukas–Bradley and Mary A. Hekman–Lielbriedis, with him on the briefs), Washington, D.C., for intervenors Full Requirements Co-op. Customers of Southwestern Public Service Co., Golden Spread Elec. Co-op., Inc. and Kimwood Elec. Co-op., Inc.

William J. McGowan, II of McGowan & McGowan, P.C., Brownfield, Texas, C. Gene Samberson of Heidel, Samberson,

Gallini, Williams and Harrington, Lovington, N.M., Richard A. Solomon and Robert W. Kneisley of Wilner & Scheiner, Washington, D.C., filed a brief on behalf of intervenors Lea County Elec. Co-op., Inc., City of Brownfield and City of Floydada, Tex.

Before McKAY and SETH, Circuit Judges, and GREENE, District Judge [*].

SETH, Circuit Judge.

These cases, Nos. 85–2117, 83–1759 and 85–1421, were consolidated for consideration and disposition. Each concerns issues which are related and which arose from orders of the federal regulatory agency directed to Southwestern Public Service Company concerning its use of investment tax credits.

*Case Nos. 85–1421 and 83–1759*

■ The petitioner, Southwestern Public Service Company, seeks a review under 16 U.S.C. § 825l(b) by this court of orders entered by the Federal Energy Regulatory Commission (23 F.E.R.C. ¶ 61,406). The petitioner had filed pursuant to 16 U.S.C. § 824d a proposed rate increase for service to several large distributors and towns. Its wholesale rates are set by the Commission while its "retail" rates are set by several state regulatory agencies. In the final order of the Commission it ordered a change in the way Southwestern had used all its investment tax credits since 1971.

The basic issue raised in this review, in general terms, is not rates but, as mentioned, concerns Southwestern's use of investment tax credits in the past. The credits here concerned were a percentage of capital expenditures made by the utility which it could use under the Act to directly reduce federal income taxes as provided by the Revenue Act of 1971 (26 U.S.C. §§ 38, 46).

From the outset (1971) the Company used the flow-through-to-earnings (FTE) method to handle the credits—the ITCs. Thus credits which were created by the

construction of power generating facilities and substantial additions to transmission plants were, over a period of a year from the time the plants were put into use, taken into earnings. Credits arising from other construction also went into earnings but at the time such facilities were placed in service. The ITCs appeared in Southwestern's statements of earnings as "other income and deductions." This use of ITCs was shown in the corporate financial statements, became a part of its capital structure, and appeared on its books and records when Commission audits were made.

The Commission by its decision here challenged held that the ITCs should have been put into a deferred account and that each year an amount, derived from the book life of the improvements generating the credits, be moved from the accumulated deferred ITC account to a credit against the federal income tax portion of its cost of service. This would benefit its ratepayers. This method of using the ITCs required by the Commission in the order under consideration is referred to as the "normalization method."

This review concerns not only the imposition of the method adopted by the Commission for the handling of the ITCs in the future (if there be any) but the action that required the Company to apply the Commission's views back to the first ITCs received by the Company for 1971 and to so reverse its use of the credits in past years.

The Commission required, in substance, that all ITCs since 1971 be accounted for under the normalization method of ITC treatment. It required for accounting purposes that there be created, or that there be placed in an accumulated deferred ITC (ADITC) account, the amount that would have been in that account relative to the *wholesale portion* of its business had the Company since 1971 applied the normalization method instead of the FTE method; it required the Company to shrink the *equity capital* of the Company by that same amount; and it also required the Company

* Honorable J. Thomas Greene, United States District Judge for the District of Utah, sitting by designation.

for ratemaking purposes to reduce the common equity portion of its capital structure by the total of *retail ADITCs* that would have been in such a deferred account had the Company normalized since 1971.

The Company does not challenge the prospective application of normalization but only the order insofar as it requires the financial-accounting adjustments as a consequence of the application of normalization back to 1971 to replace the flow-through-to-earnings method the Company used since that time.

The Company estimates that the order by its retroactive application would reduce its common equity for ratemaking purposes by $42,442,000, a substantial change in equity capital, and so reduce future earnings, require more requests for rate increases, and make the stock and bonds less attractive. It would alter past financial statements issued which showed the use of the ITCs and which were theretofore relied on, and also upset the corporate financial decisions which were based on the use of ITCs made over the years. The Company officials testified that the use of the ITCs made by the Company in large part enabled the Company to shift from gas fired generation to coal and otherwise benefitted the ratepayers. The state regulatory agencies had accepted the method used by the Company.

The Company thus urges, based on the testimony introduced, that an upheaval would be caused by the order which would seriously damage the "financial integrity" of Southwestern as described. It thus urges that the order *in its retroactive application* is arbitrary, capricious, and an abuse of discretion. It also states that the order constitutes a confiscation of its property.

*1971 Revenue Act*

The 1971 Revenue Act which provided for the ITCs was accompanied by an Internal Revenue Code provision, Pub.L. 92–178 § 105(c), 85 Stat. 499 (26 U.S.C. § 46(e), later redesignated as § 46(f)). This provision limited the authority of regulatory agencies in their treatment of ITCs of utilities *should the regulatory body decide to take ITCs into consideration in ratemak-*

*ing.* It also required the utility to make an election under 46(e) by a stated date *in the event the agency decided* to take into account ITCs. However, if the agency did not decide to use the ITCs in ratemaking no election by the utility was required. This election aspect of the Code we do not consider significant. Southwestern made a "conditional election" but this was not contemplated by the Act and was of no effect.

The Company asserts that the Commission did nothing until these proceedings by way of orders, policy statements, or other methods to indicate that it would use the ITCs in ratemaking. Thus it argues that its use of the ITCs was proper and § 46(e) was not triggered.

The Revenue Act and the Code provision of § 46(e) do not require, nor is it elsewhere required, that any particular use of the ITCs of utilities be made unless and until the regulatory agency takes some action to direct the sharing of the benefits of the ITCs between the ratepayers and the investors as would the affirmative adoption of the normalization method. The legislative history demonstrates that it was intended by Congress to permit the regulatory agencies, if they saw fit, to make a determination whether or not to divide the benefits. This determination would require the regulatory agency to act. *See* S.Rep. No. 437, 92d Cong., 1st Sess. 36 (1971) *reprinted in* 1971 U.S. Code Cong. & Admin.News 1943. It appears that the Commission is of this view. *See* 22 F.E.R.C. ¶ 61,341 at 61,587, Record at 3564.

As to whether the Commission before this case took action to impose normalization on any of the utilities it regulated is a strongly contested issue on this review. Some utilities, probably most, had voluntarily adopted normalization. But did the Commission before this case arose decide to use the ITCs in ratemaking? If it did not do so, the Company argues that it was permitted to use the flow-through-to-earnings method it had adopted.

The record demonstrates that the Commission issued no directives, rules, or regulation as to ITCs. The periodic audits of the Company records by Commission audi-

tors did not make reference to the use of ITCs, but this would not have necessarily been done. The opinion of the Commission in this case states that it relied only on case law precedents in asserting that it had taken action, and thus it must as to this point stand or fall on such cases. The Commission cited the cases it relied on. These cases were: Carolina Power & Light, 4 F.E.R.C. ¶ 61,107, and *Public Service Co. of N.M. v. F.E.R.C.*, 653 F.2d 681 (D.C.Cir.).

The staff and the intervenors have not brought to our attention any authority before 1978 which even arguably supports their position that there was a long-standing policy announced by the Commission. The Commission, as mentioned, relied on Carolina Power & Light, 4 F.E.R.C. ¶ 61,107, to support its position that it had imposed the normalization method for using ITCs. In *Carolina Power* the issue was the rate of return on accumulated ITC funds when the Company had used them directly to reduce cost of service charge. The Company had already used the normalization method and no issue was raised as to its use. The Company did not urge that it could flow-through-to-earnings the ITCs. Nothing but the rate of return was decided. The Commission did make an observation that it thought the legislative history of the Act suggested normalization. Again, this appeared only as an observation, and was in no way a notice to the industry. As mentioned the company there concerned was using the normalization method so the observation was not significant as to other utilities nor as to the discretion it had under the 1971 Act. *See Michigan Wisconsin Pipe Line Co. v. F.P.C.*, 520 F.2d 84, 89–90 (D.C.Cir.). The Commission also relied on *Public Service Co. of N.M. v. F.E.R.C.*, 653 F.2d 681, a 1981 opinion from the District of Columbia Circuit, which, as did *Carolina Power*, concerned the rate of return to be allowed on accumulated ITCs funds resulting from normalization. The company there involved did not advance any other method.

It must be concluded from the cases in the opinion of the Commission used as the basis for its decision, and the complete absence of any administrative action to in-

dicate there had been theretofore no use of ITCs in its ratemaking, there is nothing in the record to support the position of the Commission that it had taken action to avail itself of the discretion afforded by the Revenue Act to have the utilities use the ITCs in any particular way. It was thus a new policy announced in this case and sought to be applied retroactively.

It must also be mentioned that the Commission had approved prior rate filings by the Company which were predicated in part on the Company's use of ITCs. These rate filings however were "settled" and the ITC issue did not arise as such.

The Commission ordered a retroactive adjustment of its accounts as if normalization were applied for ITCs received since 1971. These ITCs were earned and used in the same way (flow-through-to-earnings) by the Company since 1971. This, of course, covered the period before the rates then under consideration went into effect and required the significant financial-accounting and capital structure adjustments. The Commission did not attempt to require adjustment of *old rates* nor order refunds as this it could not do. The Commission had approved the rates in prior cases. *Montana–Dakota Utilities v. Northwestern Public Service Co.*, 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912. However, the order was retroactive into the period during which the Commission had taken no action under § 46(e) and this the Commission could not do. The Commission's interpretation of the law was not correct.

The hearing officer had rejected the retroactive application of the Commission's position here taken as inequitable and unfair. 18 F.E.R.C. ¶ 63,006 at 65,032. The hearing officer also concluded that the customers had benefitted from the Company's use of the ITCs as an indirect sharing resulted (18 F.E.R.C. ¶ 63,007).

*Standard of Review*

A consideration of the standard this court should apply on review of the Commission order should start with the opinion of this court in *Stewart Capital Corp. v. Andrus*, 701 F.2d 846 (10th Cir.), the Ad-

ministrative Procedure Act, 5 U.S.C. § 551, *Diamond Ring Ranch, Inc. v. Morton,* 531 F.2d 1397 (10th Cir.), *Sabin v. Butz,* 515 F.2d 1061 (10th Cir.), and *Glass v. United States,* 506 F.2d 379 (10th Cir.).

In *Sabin v. Butz,* we stated that a review under the Administrative Procedure Act included an examination to see if the administrative agency in its decision had grounded its determination on all the relevant factors and whether there was a clear error of judgment.

In *Stewart,* we considered an oil and gas lease application filed under the Mineral Leasing Act and pursuant to BLM regulations, 43 C.F.R. § 3102.6–1(a)(2). The drawing entry card under the regulation was to be signed by the one submitting it and was to contain an "agency statement" if submitted by an attorney in fact. The drawing entry card in question was the one first drawn in the lottery but was rejected by the BLM. It had been prepared and submitted by an agent (Stewart) using a facsimile signature stamp and did not contain an agency statement. This type of offer had been used by Mr. Stewart over a six-year period for several thousand applicants and some 400 of these offers had been first drawn in the lottery and awarded to his clients. In this instance the BLM rejected the offer for the reason that it did not comply with the above regulation in that no agency statement appeared. This was done on the basis of another filing in Utah by Mr. Stewart which had been rejected for the same reason (D.E. Pack, 30 I.B.L.A. 166, 84 I.D. 192 (1977)). The *Pack* case was appealed in Utah and in *Runnells v. Andrus,* 484 F.Supp. 1234 (D.Utah). The court reversed the *Pack* decision to the extent it had retroactive effect.

In *Stewart* we affirmed the trial court's decision that as to the lease in issue the retroactive application of the B.L.M. interpretative rulings could not be given retroactive effect. The doctrine there described as to administrative decisions should be applied here. We said in *Stewart:*

"The [trial] judge recognized that an administrative agency's interpretation of its own regulation is to be given some deference by a reviewing court. The trial court employed a highly rational balancing test for determining whether an administrative decision such as that in our case ought to be applied retroactively or prospectively. *SEC v. Chenery,* 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). The Supreme Court there said in effect that an administrative decision such as that before us should be carefully balanced to ascertain whether or not it should be applied prospectively only. The standards to be utilized are set forth in *Retail, Wholesale, and Department Store Union v. NLRB,* 466 F.2d 380 (D.C.Cir.1972). They are as follows:

"1. Whether the particular case is one of first impression;

"2. Whether a new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of the law;

"3. The extent to which a party, against whom the new rule is applied, relied on the former rule;

"4. The degree of burden which a retroactive order imposes on a party; and

"5. The statutory interest in applying a new rule despite reliance of a party on an old standard.

"The trial court applied the tests outlined above and concluded that the facts thus tested did not favor Diboll's claim."

In *Stewart,* we described good faith reliance on the B.L.M.'s acceptance of prior identical facsimile applications as an "important factor." Also we considered the references in *S.E.C. v. Chenery Corp.,* 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995, as to retroactivity which were:

"That ... [agency] action might have a retroactive effect ... [is] not necessarily fatal to its validity. Every case of first impression has a retroactive effect, whether the new principle is announced by a court or by an administrative agency. But such retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles. If that mischief is greater than the

ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law."

*Stewart* concluded that it was an abuse of discretion for the agency to apply the *Pack* decisions retroactively. In *Stewart* we said of the fifth element above quoted:

"We note once again that the Supreme Court in *Chenery Corp., supra,* held that the ill effects of retroactive application in agency decisions are to be balanced against the beneficial need for such application."

Retroactive application of administrative decisions was also considered by the Fifth Circuit in *McDonald v. Watt,* 653 F.2d 1035 (5th Cir.), which followed the *Chenery* balancing test.

We see no finding, *supported by substantial evidence,* that the use of the ITCs by Southwestern was in some way unreasonable. *See ANR Pipeline Co. v. F.E. R.C.,* 771 F.2d 507 (D.C.Cir.).

We must conclude that the application of the doctrine set forth in the cases of this court, the doctrine as to the standard of review generally, and in *Stewart* as to retroactivity, leads to the conclusion that the order here considered cannot be applied retroactively. Insofar as the order applies to any practice other than prospectively as to the use of ITCs by the Company it is arbitrary and capricious and is hereby set aside.

## Unbilled Revenues

■ This issue concerns "accrued unbilled revenues" and whether they should be included in the rate base of the Company or should be excluded as the Commission ordered. The Administrative Law Judge described an element which the Company sought to include in its rate base as follows:

"D. *Accrued Unbilled Revenues:* SPS seeks to have 'accrued unbilled revenues' of $516,546 included in its rate base as assets. This figure represents fuel costs actually incurred on behalf of SPS's Wholesale 1 customers, but not recovered from those customers during the test period. Those unbilled revenues, allegedly corresponding to actual fuel costs, are said to be generated through the operation of SPS's fuel adjustment clause, a clause designed to permit recovery of the cost of fuel in the second month following the month during which the fuel costs were incurred."

The Administrative Law Judge also noted:

"Staff contends that SPS's methods of billing do not exhibit the characteristics of true unbilled revenues. SPS's clause became effective in July 1964, at which time the first billing was sent to customers. There was no lag in billing. No bill was deferred when the clause became effective, and no bill has been sent to any discontinued customer to recover any unbilled amount. Staff terms the two-months-late billing a 'proxy' for current fuel expenses."

Also:

"Staff also asserts, and correctly, that SPS has no legally enforceable claim for the amounts in question, since they are not recoverable under the terms of its Wholesale 1 fuel adjustment clause. If a customer discontinues service, SPS has no right under that clause (and makes no attempt) to bill that customer two months later for any deficiency."

The Administrative Law Judge noted that the Company failed to show and made no attempt to show the reality of the amounts shown. The Commission agreed with the Administrative Law Judge.

The Company strongly challenges the determinations as a general holding that "assets" have to be shown to be "legally collectible." We do not read the opinions as so concluding although elsewhere in the Administrative Law Judge's opinion the matter is treated in more general terms. The holding by the Administrative Law Judge that no attempt was made to show collectibility to support such an account is significant in our view. "Collectibility" is not an accurate description of this element as a shorthand term. It is apparent that the holding was not that "legally collectible" was not a condition placed on all assets as the Company argues. Instead, the Company did not demonstrate how un-

der accepted accounting practices the accrued unbilled revenues were "assets" for the purpose they were sought to be used. The matter was basically a failure of proof to support the request that the account be included in the rate base.

The action of the Commission as to accrued unbilled revenues is upheld as is the related requirement for adjustment of the Company's fuel adjustment clause.

*Case No. 85–1421*

This case arose from 29 F.E.R.C. ¶ 61,279 and 29 F.E.R.C. ¶ 61,056. The orders here concerned required that the Company exclude the ADITC balance from its capital structure and this is a continuation of adjustments contemplated by the Commission in Case 83–1759. The opinion, above, in 83–1759 is applicable to this petition for review, and the orders entered herein are set aside.

*Case No. 85–2117*

Southwestern Public Service Co. filed in August 1984 with the Federal Energy Regulatory Commission under 16 U.S.C. § 824d for a wholesale rate increase for its full requirements customers (New Mexico Power Company and seventeen rural electric cooperatives). The increase would yield about $12,000,000 in two phases. It also sought to increase rates to its partial requirements customers most of whom were cities.

The proposed rates were suspended for different periods for the two classes, and the Commission at 29 F.E.R.C. ¶ 61,056, at 61,123, ordered Southwestern "to exclude the ADITC balance from its capital structure." There was a difference of opinion as to whether this ordered exclusion covered ITCs included as a separate component in capital or whether it pertained to those lumped into equity. The Commission insisted that this included "all ADITC" included in the equity component of the capital structure. This difference continued into Case No. 85–2117.

The Company urges that the ordered removal of the retail-related ITCs accumulated since 1971 (about $57,000,000) as directed by its retail-state regulatory agencies was done by the Commission without consideration of the Company position that these sums were not a separate component of retained earnings. This difference was not resolved by reason of the disposition made by the Commission.

The adjustments ordered by the Commission must be set aside until it can by hearing assess the impact of the decision of this court in Cases 85–1421 and 83–1759 which held that the retroactive application of Commission policy as to the use of ITCs could not be applied retroactively.

The removal of the retail-ITC balances from equity capital as ordered by the Commission is thus set aside as is the entire order, 29 F.E.R.C. ¶ 61,056, and the matter remanded to the Commission.

No. 85–2117 concerns further orders by the Commission that held that the Company's rate filing were deficient for the reason that it had not excluded ADITCs from the equity component of its capital structure. This related to the retail-related ITCs then in equity. This dispute over the construction of previous orders was continued, the issue being whether the Commission had ordered removal of ITCs appearing as separate components of the capital structure or those just in the equity portion. A clarification order as the May 20 here concerned is appealable. *Cities of Newark, New Castle and Seaford, Delaware v. F.E.R.C.,* 763 F.2d 533 (3d Cir.). An issue is again raised as to whether the ordered adjustments "all ITCs" will reduce the cost of service more than a ratable portion of the ITCs and so trigger disallowance.

We must hold that the issues in 85–2117 cannot be resolved until the adjustments are made as required in our decision in Nos. 85–1421 and 83–1759, and a hearing is held in this case to decide the issue concerned. The retail ITC use was not considered at a hearing before the letter order was issued.

The cases represented by our numbers 85–1421, 83–1759 and 85–2117 are each remanded to the Commission for further proceedings as all the orders entered by the Commission in each are hereby set aside,

as above recited, except only insofar as the order in 83–1759 pertains to the use of "unbilled revenues" and whatever changes in the Company fuel adjustment clause may be required from the ordered use of "unbilled revenues."

IT IS SO ORDERED.