**LA PORTE TRANSIT COMPANY, INC.,**
Petitioner, Cross–Respondent,

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent,
Cross–Petitioner.**

Nos. 87–2732, 87–2932.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 14, 1988.

Decided Nov. 1, 1989.

Charles S. Mishkind, Miller, Canfield, Paddock & Stone, Grand Rapids, Mich., for La Porte Transit Co., Inc.

Aileen A. Armstrong, W. Christian Schumann, William A. Baudler, N.L.R.B., Appellate Court—Enforcement Litigation, Washington, D.C., for N.L.R.B.

Before CUDAHY, RIPPLE, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

La Porte Transit Company, Inc. proposed to the union which represented La Porte's employees certain wage and benefits changes pursuant to a mid-term reopener provision of the parties' collective-bargaining agreement. Before the union agreed to submit the proposals to the union's membership, La Porte unilaterally implemented three of the four proposals without notice to the union. Thereafter, the union declined to submit the proposals until La Porte remedied these violations. La Porte refused, insisting that the union comply with its decision to submit the proposals to its membership.

The union filed a grievance with the National Labor Relations Board ("NLRB" or the "Board"). An Administrative Law Judge ("ALJ"), whose findings the NLRB largely adopted, found that La Porte had not bargained to good-faith impasse at any time prior to implementing its proposals and thus had violated the National Labor Relations Act ("NLRA"). The NLRB ordered La Porte to remedy its violation. We grant the NLRB's petition to enforce the order.

## I. BACKGROUND

The parties do not dispute the basic facts underlying this appeal. Instead, they focus upon the inferences and conclusions which may be reasonably drawn from the facts. We set forth the uncontested facts here.

La Porte Transit Company, Inc. is a small Indiana-based general commodities carrier engaged in the business of transporting freight. General Teamsters, Chauffeurs and Helpers' Union Local No. 298 has been the exclusive bargaining representative of La Porte's approximately sixty to seventy drivers and dock workers for over twenty years.

In 1982, La Porte and the union negotiated a collective-bargaining agreement which was effective by its terms from April 1, 1982, through March 31, 1985. The agreement stated that it was "supplemental to and ... part of the [Teamsters] National Master Freight Agreement ... including any [Teamsters] Central State Area supplemental agreements ... and [would] prevail over the specific terms of those agreements to the extent, if any, any conflict exist[ed] and/or the subject matter [was] covered by the terms of th[e] Supplemental Agreement." The Teamsters National Master Freight Agreement contained a reopener provision which allowed either party to reopen the agreement upon sixty days prior written notice and to request renegotiation of any provisions of the agreement which were unreasonable in light of "any Congressional or Federal agency action which has a significantly adverse effect on the financial structure of the trucking industry...."

On February 3, 1983, La Porte called a meeting with union representatives to discuss La Porte's concerns regarding the impact of the 1980 Motor Carrier Act on La Porte's business. La Porte feared that the Motor Carrier Act had created "over-capacity" in the trucking industry and that, as a result, La Porte had "competition coming out [its] ears." At the meeting, La Porte told the union that La Porte needed to replace some of its equipment and that it was concerned that a cost-of-living adjust-

ment ("COLA") scheduled to take effect on April 1st under the parties' bargaining agreement was going to cause "a problem." La Porte also told the union that it was "going to be needing relief" from the contract's provisions and that such relief would have to be "over and above [relief from] the [COLA] increase which was due on April 1st...."

The union told La Porte that any relief from the provisions of the collective-bargaining agreement would have to be approved by the Joint Area Committee of the Teamsters International Union, which is a group of employer and union representatives which administers the Teamsters' national contract on a regional basis.

On February 11, 1983, La Porte sent to the union a written proposal for modification of some of the parties' collective-bargaining agreement's provisions. La Porte's proposals included requests to eliminate the COLA scheduled to take effect on April 1st, to eliminate certain holidays, and to waive all sick leave benefits.

On March 18, 1983, La Porte and the union met again. At the meeting, La Porte submitted a revised set of proposals to the union, requesting changes in the manner of providing health and welfare benefits and the methods for computing overtime. The union responded that the Joint Area Committee would have to approve such changes and asked La Porte to "hold the proposals until after the Joint Area Committee had an opportunity to meet on the issue of granting area-wide relief."

On April 1, 1983, La Porte unilaterally implemented its proposals regarding holiday pay, the COLA, and sick pay without notifying the union. After April 1, La Porte stopped paying the employees for sick days, failed to pay the COLA scheduled to take effect on April 1, and refused to grant the employees their birthdays off as paid holidays.

La Porte and the union representatives next met on April 7, 1983. La Porte agreed to withdraw its proposal regarding health and welfare benefits. The union—which did not know that La Porte had implemented three of its other proposals—

told La Porte that the withdrawal of its health and welfare proposal would make it easier for the union to obtain approval from the Joint Area Committee. The union's business agent stated that he "didn't really feel anything [in La Porte's remaining proposals] was ... grossly unreasonable" and that if the union's president approved the action, the matter would be taken to the union's membership. He also stated that, if the membership voted to accept La Porte's proposals, the union would then submit the matter to the Joint Area Committee at its meeting in June. The union's business agent further stated that "in order to even bring a relief request before the Joint Area Committee ... the contract had to be paid in full at the time, or relief wouldn't even be considered." La Porte apparently believed that the parties "really had a deal."

On April 11, 1983, La Porte hand-delivered a revised proposal to the union which incorporated the changes sought at the April 7 meeting. La Porte also submitted a "justification statement" setting forth reasons why La Porte needed relief.

The union's business agent called La Porte's personnel director on April 12 and told him "that [the union's president] had agreed to take [La Porte's] proposal[s] to the membership and would do so in two to three weeks, so that [they] would be in preparation for the June meeting of the [Joint Area Committee]."

In early May, the union found out that La Porte already had implemented three of its proposals. On May 9, 1983, the union filed a grievance, alleging that La Porte had violated the parties' collective-bargaining agreement.

La Porte sent a letter to the union on June 23, 1983, inquiring why the union had not submitted La Porte's proposals to its membership for a vote and whether the union wanted to meet with La Porte for further negotiations. On July 5, the union sent to La Porte a letter confirming that the union had agreed to submit La Porte's proposal for a vote. However, the union noted that it had filed a grievance to which La Porte had not yet responded and that

"[t]he Union cannot consider a request for relief unless the contract is being paid in full."

On July 11, 1983, La Porte and the union met to discuss the union's grievance. La Porte contended that it "didn't understand what our contract being current had to do with acceptance or rejection of our proposal." La Porte disputed the union's allegations. The meeting concluded with the parties unable to resolve the grievance.

The union sent a letter to La Porte on August 1, 1983, again stating that it would not consider La Porte's request for relief unless La Porte was in full compliance with the parties' contract. On August 8, La Porte responded, asking whether the employees would be allowed to vote on La Porte's proposals. The union never responded.

On August 11, 1983, La Porte and the union met again to discuss the grievance. The union's representative stated that the union wanted to proceed with the grievance, but La Porte refused to proceed. On the same day, La Porte sent a letter to the union, stating that it believed that the attempt to negotiate its proposal had "resulted in an impasse." Consequently, La Porte stated that it would now implement its previous proposals. The August 11 letter was La Porte's first written notice to the union that La Porte had implemented three of its proposals on April 1. On August 24, La Porte sent another letter to the union, stating that it would implement new overtime rules beginning October 2, 1983.

On September 1, 1983, La Porte sent identical letters to federal and Indiana mediation officials, stating that it previously had several negotiation sessions with the union for the purpose of obtaining relief under its collective-bargaining agreement and that negotiations had concluded when La Porte submitted its final proposal to the union on April 11, 1983. The letter stated that an impasse in negotiations had resulted and that La Porte planned to implement its proposals immediately. The September 1 letters were La Porte's first notice to mediation authorities.

The union filed an unfair labor practice charge on September 6, alleging that La Porte had instituted unilateral changes in violation of sections 8(a)(1) and (5) of the NLRA, 29 U.S.C. § 158(a)(1), (5). On April 10, 1984, an ALJ published his opinion, finding against La Porte. La Porte filed exceptions to the ALJ's opinion, along with supporting briefs, with the NLRB. Approximately three and one-half years later, the NLRB issued its decision, largely adopting the ALJ's opinion. The NLRB held that La Porte had violated the NLRA by unilaterally modifying wage and hour provisions of its collective-bargaining contract with the union during the term of the contract. The Board also found that La Porte did not bargain to good-faith impasse at any time prior to implementing its proposals on April 1 and October 2. Further, because good-faith impasse was never reached, the NLRB did not decide whether the parties' reopener clause could justify unilateral implementation of changes under certain circumstances.

The NLRB also adopted the ALJ's order requiring La Porte to cease and desist from engaging in the unfair labor practices and from acting in any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed by Section 7 of the Act, 29 U.S.C. § 157. The Board's order requires La Porte to bargain with the union by restoring, placing in effect, and complying with the terms and conditions of the parties' contract, retroactive to April 1, 1983; to make the employees whole for any loss of earnings and other benefits suffered as a result of La Porte's unlawful actions; and to post copies of a remedial notice.

## II. DISCUSSION

La Porte concedes that it violated the NLRA when it unilaterally implemented three of the four proposals on April 1, 1983. Nevertheless, La Porte believes that its liability for those violations ended when it, in its opinion, subsequently bargained to good-faith impasse. La Porte argues this occurred on April 11, 1983, or no later than August 12, 1983. La Porte also contends

that it bargained to good-faith impasse prior to unilaterally implementing the new overtime policies on October 2, 1983.

Initially, we agree with La Porte "that where an employer and a union have bargained in good faith, despite the employer's prior unilateral changes in wages and conditions of employment, the employer's liability for the unlawful unilateral changes terminates on the date when the parties execute a new agreement or reach a lawful impasse." *NLRB v. Cauthorne*, 691 F.2d 1023, 1026 (D.C.Cir.1982). We thus must determine if the NLRB correctly concluded that La Porte never bargained to good-faith impasse at anytime during the period in issue or whether the parties in fact bargained to good-faith impasse at some point which ended La Porte's liability.[1]

■ To determine whether parties have negotiated to goodfaith impasse, the NLRB traditionally considers (a) the parties' bargaining history, (b) the parties' good faith in negotiations, (c) the length of the negotiations, (d) the importance of the issues over which there is disagreement, and (e) the contemporaneous understanding of the parties as to the state of negotiations on the crucial date. *See Taft Broadcasting Co.*, 163 N.L.R.B. 475, 64 L.R.R.M. 1386 (1967), *petition for reh'g. denied sub nom. American Fed'n of Television & Radio Artists v. NLRB*, 395 F.2d 622 (D.C.Cir. 1968). Contrary to La Porte's assertions, we do not believe that it can demonstrate that the NLRB's findings of fact are not " 'supported by substantial evidence on the record considered as a whole,' " *NLRB v. Parents & Friends of the Specialized Living Center*, 879 F.2d 1442, 1448 (7th Cir. 1989) (citing 29 U.S.C. § 160(e) and *Universal Camera v. NLRB*, 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951)), or that its legal conclusions "are irrational or inconsistent with the Act," *NLRB v. Financial Inst. Employees*, 475 U.S. 192, 202, 106 S.Ct. 1007, 1012, 89 L.Ed.2d 151 (1986).

As La Porte alleges, the record does not reflect that the parties had experienced any unfair labor practices or significant labor disputes in the years preceding the fateful period involved here. However, we are unable to conclude, as La Porte argues, that the other factors clearly cut in its favor and render the NLRB's decision improper.

For example, the NLRB's decision reveals that it considered the effect of La Porte's unilateral actions upon its claims of "good faith" bargaining. The NLRB observed that "there can be no doubt that the bargaining process [after April] was seriously hindered by the unlawful unilateral changes in April." We uphold this finding by the Board.

■ We believe that there is no "presumption that an employer's unfair labor practice automatically precludes the possibility of meaningful negotiations and prevents the parties from reaching good faith impasse." *Cauthorne*, 691 F.2d at 1025; *see also Rayner v. NLRB*, 665 F.2d 970, 978 (9th Cir.1982). To find otherwise would reflect "an impermissibl[e] punitive justification for continuing liability when good faith negotiations between the parties have exhausted the prospects of concluding an agreement." *Cauthorne*, 691 F.2d at 1025. However, while no *per se* rule or presumption exists, the NLRB nevertheless could, and properly did, consider the effect of La Porte's decision to implement unilateral changes at a crucial time in the bargaining process upon the overall nature and progress of the negotiations.

■ In addition, the NLRB considered the overall length and nature of the negotiations themselves. It found that "the only bargaining session held subsequent to April, and before the change in overtime was announced, was a meeting on [July 11th] where little progress was made." We agree that the meeting, and the written

---

1. From the outset, we reject La Porte's characterization of the NLRB decision as "yet another perfunctory, incomplete and inconsistent decision." We do not believe that the NLRB reached an erroneous outcome by undertaking a "simplistic approach and analysis of this case."

In sum, we cannot find that the NLRB has totally disregarded our earlier pronouncements in *Int'l Union v. NLRB*, 802 F.2d 969, 972–75 (7th Cir.1986), and we will focus upon the merits of the arguments advanced by the parties here.

correspondence between the parties both before and after the meeting, could be found to be insufficient negotiations to amount to impasse. *See, e.g., Electrical Mach. Co. v. NLRB*, 653 F.2d 958, 963 (5th Cir.1981) (impasse "is a deadlock in negotiations and presupposes negotiations"); *NLRB v. Big Three Indus.*, 497 F.2d 43, 48 (5th Cir.1974) (" 'impasse' within the meaning of the federal labor laws presupposes a reasonable effort at good-faith bargaining which, despite noble intentions, does not conclude in agreement between the parties"); *Blue Grass Provision Co. v. NLRB*, 636 F.2d 1127, 1130 (6th Cir.1980), *cert. denied*, 452 U.S. 915, 101 S.Ct. 3049, 69 L.Ed.2d 418 (1981) (impasse "encompasses the notion that both sides ... have made more than a perfunctory attempt to reach a resolution"). Thus, we cannot conclude that the NLRB's findings are erroneous, especially because a determination concerning the existence of impasse "is an inquiry 'particularly amenable to the expertise of the Board as fact finder.'" *Richmond Recording Corp. v. NLRB*, 836 F.2d 289, 293 (7th Cir.1987) (quoting *Huck Mfg. Co. v. NLRB*, 693 F.2d 1176, 1186 (5th Cir.1982)); *see also Dallas Gen. Drivers v. NLRB*, 355 F.2d 842, 844–45 (D.C.Cir.1966) (stating, "in the whole complex of industrial relations few issues are less suited to appellate judicial appraisal than evaluation of bargaining processes or better suited to the expert experience of a board which deals constantly with such problems"); *NLRB v. J.H. Bonck Co.*, 424 F.2d 634, 638 (5th Cir.1970) (whether an impasse exists "is a question

of fact particularly suited to the Board's expertise").

La Porte also contends that the NLRB failed to acknowledge that the "financial distress" which La Porte was experiencing, or at least was about to experience, dictates a finding of impasse at an earlier point in the negotiations. While the existence of such a condition is important, as the NLRB has recognized in the past, it becomes much less important in a determination of impasse as a means to limit liability for a violation which has already been committed. That is, when one party's good faith is already in issue because of unilateral action taken at a time when negotiations were still active and promising, additional hardship which that party might experience because of lengthy negotiations which are necessary to "undo" its own wrong has diminished import in the determination of the existence of a post-violation impasse.

An examination of the above factors tends to support the NLRB's conclusion that La Porte failed to negotiate to good-faith impasse on August 11, 1983.[2] Thus, we will uphold that conclusion.

■ We also reject La Porte's attempt to argue that the union's refusal to submit La Porte's proposals to the union membership until La Porte remedied the NLRA violations which occurred when La Porte refused to pay holidays, the COLA, and sick leave after April 1, 1983, somehow relieved La Porte of its liability for its imprudent course of action.[3] We agree with the

---

**2.** We also agree with the NLRB that the parties had not reached impasse on April 12, 1983. In *Bell Transit Co.*, 271 N.L.R.B. 1272, 117 L.R.R.M. 113, *rev'd and remanded sub nom. Teamsters Local Union No. 175 v. NLRB*, 788 F.2d 27 (D.C.Cir.1986), the NLRB found that a genuine impasse can exist simultaneously with a tentative agreement, such as La Porte and the union reached on April 12, 1983, when the union agreed to submit La Porte's proposals to the union's membership. However, contrary to La Porte's assertions, *Bell Transit* does not create an absolute rule concerning tentative agreements and impasses, but only a possible scenario. In addition, the Board has overruled *Bell Transit* to the extent that it indicated that an impasse and tentative agreement may exist simultaneously. *Francis J. Fisher, Inc.*, 289 N.L.

R.B. No. 104 n. 1, 131 L.R.R.M. 1082 (July 13, 1988).

**3.** The NLRB argues that La Porte waived its arguments that (i) the union's insistence that La Porte reinstitute the unlawfully modified contract provisions before the union would submit the proposals to the membership was an unlawful refusal to bargain, and (ii) the union's agreement on April 12 that it would submit the proposals constituted impasse. This argument is based on section 10(e). However, it appears that in the exceptions to the ALJ's decision, which were filed with the Board, La Porte sufficiently apprised the Board of La Porte's objections to the ALJ's findings on these issues. *See NLRB v. Best Products Co.*, 765 F.2d 903, 909 (9th Cir.1985). We reject the NLRB's reading of *International Ladies' Garment Workers' Union v.*

NLRB that the provisions which La Porte unilaterally implemented involved "mandatory" bargaining subjects. *Singer Mfg. Co.*, 24 N.L.R.B. 444 (1940), *enf'd as modified*, 119 F.2d 131 (7th Cir.1941) (holidays are a mandatory bargaining subject); *NLRB v. Sharon Hats, Inc.*, 289 F.2d 628 (5th Cir.1961) (holidays are a mandatory bargaining subject); *Great Southern Trucking Co. v. NLRB*, 127 F.2d 180 (4th Cir.), *cert. denied*, 317 U.S. 652, 63 S.Ct. 48, 87 L.Ed. 524 (1942) (vacations are a mandatory bargaining subject). Therefore, the union did not violate section 8(b)(3) of the NLRA by insisting that La Porte comply with the terms and provisions of an existing collective-bargaining agreement.

Similarly, we find no merit in La Porte's contention that the union violated section 8(b)(3) of the NLRA by, in La Porte's opinion, "condition[ing] bargaining on settlement or abandonment of unfair labor practice charges or litigation." Clearly, a party cannot condition bargaining upon dismissal of pending unfair labor practice actions. *See Central Mack Sales*, 273 N.L.R.B. 1268, 1274, 118 L.R.R.M. 1615 (1984). However, we must agree with the NLRB that the union's insistence that La Porte honor and comply with an existing and enforceable collective-bargaining agreement cannot be equated with a demand to abandon any defenses which La Porte might have to unfair labor practice allegations regarding such unilateral modifications of contract provisions. Thus, we again reject La Porte's attempt to shirk its liability for its own decision to implement

*Quality Mfg. Co.*, 420 U.S. 276, 95 S.Ct. 972, 43 L.Ed.2d 189 (1975), as interpreting section 10(e) to require a party to file a motion for reconsideration with the Board asserting errors in the Board's modification of an ALJ's decision. That case involved a determination by the Board of an issue which was not raised by the parties. *Id.* at 281, 95 S.Ct. at 975 n. 3. In that situation, a motion for reconsideration might be required. Here, the Board decided only issues which were raised by the parties.

4. We likewise find no merit in La Porte's argument that the union "reneged" upon its agreement to submit the modification proposal to the union's membership. The record reveals that

unilateral changes at a time when negotiations were active and promising.[4]

■ Finally, we hold that the NLRB did not err when it decided that the parties had not reached impasse prior to La Porte's implementation of its proposal concerning the changes in overtime policy. The NLRB observed that La Porte's proposal regarding overtime "was part and parcel of [La Porte's] overall package for relief from the economic provisions of the [collective-bargaining agreement]" and that "it appears that [La Porte] simply completed in October the implementation of the remainder of its overall economic package, [the bulk of which it] initially implemented unlawfully in April." We agree that no significant or effective bargaining occurred regarding the overtime proposal; La Porte made little effort to engage in meaningful negotiation. Thus, the NLRB correctly imposed liability for violation of the overtime provisions of the collective-bargaining agreement.[5]

### III. CONCLUSION

La Porte concedes that it unilaterally implemented its proposals for changes in the terms of the parties' collective-bargaining agreement and thus violated the NLRA. La Porte cannot demonstrate that it bargained to good-faith impasse after its unlawful action. Consequently, we conclude that La Porte failed to limit its liability for its admitted violations and that the NLRB's remedial order is reasonable under the circumstances of this case.

once the union discovered that La Porte had unilaterally implemented the proposals without notice, the union consistently refused to submit the proposals to its members until La Porte remedied the violation. Therefore, La Porte's attempt to argue that the union failed to honor what it now believes was a "done deal" does not affect the outcome of this case.

5. Because La Porte cannot demonstrate that it bargained to good-faith impasse at anytime during the negotiations, we, like the NLRB, need not consider whether the collective-bargaining agreement's emergency reopener clause would have permitted mid-term unilateral changes if the parties had in fact negotiated to impasse.

Accordingly, the order of the NLRB is ENFORCED.