INTERMOUNTAIN RURAL ELECTRIC
ASSOCIATION, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

International Brotherhood of Electrical
Workers, Local 111, Intervenor.

No. 91–9571.

United States Court of Appeals,
Tenth Circuit.

Feb. 3, 1993.

Rehearing Denied March 11, 1993.

Martin Semple of Semple & Jackson, Denver, CO, for petitioner.

Nancy J. Gottfried, Atty., N.L.R.B. (Frederick C. Havard, Atty., Jerry M. Hunter, General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, N.L.R.B., on the brief), Washington, DC, for respondent.

Joseph M. Goldhammer of Brauer, Buescher, Valentine, Goldhammer, & Kelman, P.C., Denver, CO, for intervenor.

Before BALDOCK and HOLLOWAY, Circuit Judges, and O'CONNOR, District Judge.*

BALDOCK, Circuit Judge.

■ Intermountain Rural Electric Association ("IREA") petitions for review of an order by the National Labor Relations Board ("the Board"). IREA challenges the Board's findings that IREA violated 29 U.S.C. § 158(a)(1) and (5) by: (1) refusing to pay employee medical and dental insurance premium increases that took effect after expiration of the collective bargaining agreement ("the Agreement") between IREA and the International Brotherhood of Electrical Workers, Local 111 ("the Union"), (2) changing the method of calculating eligibility for overtime pay upon expiration of the Agreement, and (3) unilaterally implementing terms and conditions of its final bargaining proposal without having reached a valid bargaining impasse. General Counsel seeks enforcement of the Board's order in its entirety.[1] We have jurisdiction pursuant to 29 U.S.C. § 160(e) and (f).

IREA is a rural electric cooperative doing business in central Colorado. The Union is the collective bargaining representative for IREA's production and maintenance employees. The parties have a long standing collective bargaining relationship. The Agreement is the parties' most recent in a series of one-year contracts, and it expired on November 30, 1988. Between early October 1988 and November 1988, the parties met nine times to negotiate the terms of a new agreement. Upon expiration of the Agreement, four additional negotiating sessions were held, with the parties meeting for the final time on March 20, 1989. At the March 20 meeting, IREA declared an impasse and thereafter implemented the terms and conditions set forth in its final offer.

Under the provisions of the Agreement outlining medical and dental insurance, IREA paid each employee's total insurance premium. Article 27(B) of the Agreement provided, in relevant part, that IREA's "maximum contribution" to the medical premiums "shall not exceed one hundred percent (100%) of the Blue Cross and Blue Shield Insurance Company premiums...." Article 27(C) of the Agreement provided

* The Honorable Earl E. O'Connor, Senior United States District Judge for the District of Kansas, sitting by designation.

1. IREA does not challenge the Board's finding that by changing the method of selecting employees for overtime, it violated 29 U.S.C. § 158(a)(1) and (5). Accordingly, the Board is entitled to summary enforcement of the related portion of its order. *See Monfort, Inc. v. NLRB,* 965 F.2d 1538, 1540 n. 1 (10th Cir.1992).

that for dental insurance, IREA "will pay one hundred percent ... of the premiums."

At the outset of the negotiations, IREA informed the Union that the medical and dental insurers were raising their premiums on December 1, 1988. During the November 28, 1988 meeting, in reaction to the Union's rejection of IREA's total package of proposals, IREA announced that upon expiration of the Agreement, IREA would pay the new premiums only to the extent of the dollar amount it paid under the Agreement. On November 30, 1988, IREA issued a memo to employees notifying them of the increased insurance premiums and that deductions would be made from their paychecks to cover the higher costs. On December 2, 1988, the Union filed an unfair labor practice charge concerning these unilateral actions. Also relevant to the issue of medical and dental premiums is the fact that at the December 21, 1988 negotiating session, IREA refused to discuss an unrelated matter—institution of a company documents rule—because the Union had already filed an unfair labor practice charge over the company documents rule matter.

Under the provisions of the Agreement outlining overtime pay eligibility, IREA was only required to pay overtime to those employees who actually worked more than eight hours a day or forty hours a week. Despite this language, which had been included in every collective bargaining agreement since 1980, IREA continued the pre-1980 practice of including paid time off in determining that an employee had reached an eight-hour day or a forty-hour week for purposes of eligibility for overtime pay. In early 1988, the parties settled a grievance over the issue with the understanding that IREA would continue to compute paid time off towards overtime pay eligibility, but with the caveat that the entire matter would be a subject for discussion at the next union contract negotiations.

When the 1988 negotiations began, however, IREA simply proposed "no change"

in the article dealing with overtime eligibility. The Union submitted a proposal to modify the agreement to conform to the parties' practice. The ALJ and the Board found that very little discussion was devoted to the overtime eligibility proposal during the negotiations, and further found that because of IREA's failure to raise this issue at the October 26, 1988 meeting, the Union decided that its overtime proposal was a non-issue and thereafter withdrew the proposal.

At the December 21, 1988 meeting, the Union stated that it had heard that IREA intended to exclude paid time off as a basis for overtime pay.[2] The Union protested this action, claiming that the matter had not been addressed when proposals were on the table. IREA responded that it had been including paid time off in error and now the error was corrected. At an employees meeting on January 4, 1989, IREA formally announced that paid time off would no longer be used as a basis for overtime pay.

The ALJ found that IREA unlawfully changed the method of selecting employees for overtime, but dismissed the complaint allegations concerning insurance premiums and overtime eligibility, finding that the Union waived its bargaining rights in these areas. The ALJ also found that the major sources of dispute between the parties were IREA's proposals dealing with management rights and seniority status, and that differences in these two areas persisted throughout the course of negotiations and remained unsettled on March 20, 1989. Although acknowledging the unsettled differences over management rights and seniority status, General Counsel urged the ALJ that no valid impasse was possible on March 20, 1989, because IREA had, during the course of negotiations, made unlawful unilateral changes in three areas: medical and dental insurance premium payments, methods of calculating eligibility for overtime, and methods of selecting employees for overtime. The ALJ disagreed, finding

---

**2.** General Counsel contended, and the Board agree, that IREA had actually implemented the change at some point prior to the parties' December 21 meeting. The record supports this conclusion.

that the parties were at lawful impasse on March 20, 1989 because there was no causal nexus between IREA's unlawful changes in overtime scheduling—the sole unlawful unilateral change according to the ALJ— and the subsequent deadlock in negotiations. The ALJ also found that, as a result of having reached lawful impasse, IREA lawfully implemented the terms and conditions of its final proposal.

The Board agreed with the ALJ that the major sources of dispute between the parties were management rights and seniority status, and that IREA unlawfully implemented changes in overtime scheduling, but disagreed with the ALJ's other findings. The Board concluded that the Union did not waive its bargaining rights and that IREA's other unilateral actions regarding medical and dental insurance premiums and changes in eligibility for overtime pay were likewise unlawful. Additionally, the Board found that this pattern of unlawful unilateral actions by IREA had a fundamental economic impact on the employees which would likely place the Union at a bargaining disadvantage in terms of maintaining the support of the employees and undercutting the Union's authority at the bargaining table. The Board further found that IREA's unilateral actions and implied refusal to discuss issues which were the subject of unfair labor practice charges directly and substantially interfered with the bargaining process and thereby precluded the parties from reaching a valid bargaining impasse on March 20, 1989. As a result, the Board determined, IREA's implementation of the terms of its last contract offer was also unlawful.

 Our standard of review of NLRB decisions is well-settled. Although we ordinarily review questions of law de novo, if the Board's construction of the National Labor Relations Act is defensible, it is entitled to considerable deference. *NLRB v. Viola Industries–Elevator Div., Inc.*, 979 F.2d 1384, 1391 (10th Cir.1992) (citing *NLRB v. Local Union No. 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 434 U.S. 335, 350, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978)). The Board's

findings of fact must be upheld "if they are supported by substantial evidence in the record considered as a whole." *Monfort, Inc. v. NLRB*, 965 F.2d 1538, 1540 (10th Cir.1992) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951)). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Facet Enters., Inc. v. NLRB*, 907 F.2d 963, 969 (10th Cir. 1990) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). In our review of the record as a whole, we must consider the findings of both the ALJ and the Board. *Monfort, Inc.*, 965 F.2d at 1541 (citations omitted). In cases in which the ALJ and the Board reached contrary conclusions, our standard of review is not altered. *Id.*

### I.

Initially we address IREA's challenge to the Board's finding that IREA unlawfully refused to pay employee medical and dental insurance premium increases that took effect after the Agreement between IREA and the Union expired. IREA challenges the Board's finding on two grounds: (1) that preservation of the status quo did not require IREA to pay insurance premium increases, and (2) even if IREA's refusal to pay insurance premium increases amounted to a change in the status quo, the union waived its right to bargain over the issue.

 A collective bargaining agreement terminates on its expiration date like any other contract; however, the employer is required to maintain the status quo unless and until a new agreement is reached or the parties negotiate in good faith to impasse. *Litton Financial Printing Div. v. NLRB*, —— U.S. ——, ——, 111 S.Ct. 2215, 2221, 115 L.Ed.2d 177 (1991). *See also NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). "[A]n employer commits an unfair labor practice if, without bargaining to impasse, it effects a unilateral change of an existing term or condition of employment." *Litton Financial Printing Div. v. NLRB*, —— U.S. at ——, 111 S.Ct. at 2221. The requirement that a gen-

uine impasse precede unilateral action can be waived by the union for failing to request bargaining. *NLRB v. Northeast Okla. City Mfg. Co.*, 631 F.2d 669, 675 (10th Cir.1980). However, a union's waiver of such a statutory right must be expressed clearly and unmistakably. *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983). The Board has held that such a waiver must be demonstrated by "a conscious relinquishment by the union, clearly intended and expressed to give up that right." *Construction Servs., Inc.*, 298 N.L.R.B. No. 1, slip. op. at 8 (March 30, 1990), *enf. denied*, 954 F.2d 306 (5th Cir. 1992). A union does not waive its right to bargain by failing to request bargaining if such request would be futile. *Keystone Steel & Wire*, 309 N.L.R.B. No. 31, slip. op. at 16–17 (Oct. 22, 1992); *Michigan Ladder Co.*, 286 N.L.R.B. No. 4, slip. op. at 3 (Sept. 30, 1987). *See also NLRB v. Emsing's Supermarket, Inc.*, 872 F.2d 1279, 1286 (7th Cir.1989).

■ Because the determination of the status quo is a question of fact, we review for substantial evidence in the record considered as a whole. We find ample support in the record for the Board's factual finding that preserving the status quo required IREA to pay 100% of the increased health and dental insurance premiums upon expiration of the Agreement. First, the contract language itself, which defines the status quo, explicitly provided that IREA would pay, not a fixed dollar amount, but a maximum of *100%* of the health and dental premiums as established by two plans. Although the contract language clearly places a limitation on IREA's financial liability, no particular dollar figure is identified. It follows that when the dollar amount of those rates increases, so too does IREA's maximum dollar obligation. This conclusion is further supported by the fact that during the term of the Agreement, IREA actually paid 100% of the HMO coverage for employees who chose that type of medical coverage, even though the HMO plan was more expensive than the Blue Cross plan. Therefore, in practice, IREA, during the term of the Agree-

ment, did not restrict its liability to a specific dollar amount equal to the 1987–88 Blue Cross rate. Rather, IREA paid *100%* of its employees' medical and dental insurance premiums during the term of the Agreement, and therefore, to preserve the status quo, was required to pay 100% of the new premiums upon expiration of the Agreement.

■ We likewise hold that the Board's determination that the Union did not waive its right to bargain about medical and dental premiums is supported by the record. There is no indication that the Union clearly and unmistakably waived its right to bargain in this area. Rather, the Union and IREA had been discussing the subject of medical and dental premiums throughout the negotiation period preceding the expiration of the Agreement. Further, the record supports the Board's finding that it was only at the November 28 meeting, following the inability of the parties to agree to a new contract, that IREA put the Union on clear notice that it would not pay 100% of the new medical and dental premiums. At this point, there was no time left for the parties to meet again before the expiration of the Agreement and the higher rates took effect. Consequently, the Union had no opportunity to attempt further bargaining on the issue before IREA unilaterally announced its intentions to the employees.

■ Additionally, on December 2, the Union filed an unfair labor practice charge against IREA over the medical and dental insurance matter. Although the Board recognized that the filing of a charge ordinarily is not enough for a union to rebut a finding of waiver, *see Ventura County Star–Free Press*, 279 N.L.R.B. 412 (1986), it found that in the limited circumstance where, as here, the employer's own "eleventh-hour" tactic precluded the Union from otherwise exercising its bargaining rights, the Union's filing of a charge evidences an intent not to waive bargaining rights. Because we give deference to the Board's adoption of a rule that is rational and consistent with the National Labor Relations

Act, *see Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 42, 107 S.Ct. 2225, 2235, 96 L.Ed.2d 22 (1987), we will not disturb this determination.

■ Finally, the Union's failure to raise the medical and dental insurance premium issue in subsequent negotiation sessions did not indicate a conscious relinquishment of its right to bargain over the issue. The Board found, and the record supports, that IREA announced the changes as a "done deal" or a "fait accompli," not open to negotiation. As a result, the Union was reasonably led to believe that further attempts at bargaining would be futile. Likewise, IREA's refusal, at the December 21, 1988 meeting, to discuss an issue which was the subject of another unfair labor practice charge justifiably led the Union to believe that discussions concerning medical and dental insurance premiums were also barred. These facts do not establish a situation in which the Union was continually avoiding IREA's earnest efforts to sit down and bargain over the matter. *See Construction Servs., Inc.*, 298 N.L.R.B. No. 1, slip. op. at 4 (March 30, 1990), *enf. denied*, 954 F.2d 306 (5th Cir.1992). Instead, IREA's actions sent a strong signal to the Union that it had no effective role in IREA's predetermined plan; therefore, the Union was not required to go through the motions of formally requesting bargaining over the matter. *Keystone Steel & Wire*, 309 N.L.R.B. No. 31, slip op. at 16–17 (Oct. 22, 1992). *See also Southwest Forest Indus., Inc. v. NLRB*, 841 F.2d 270, 273 (9th Cir.1988) (no waiver by union if not provided meaningful opportunity to bargain before implementation of changes). For these reasons, we uphold the Board's finding that the Union did not waive its right to bargain over these issues, and IREA, by unilaterally changing the status quo, violated 29 U.S.C. § 158(a)(1) and (5).[3]

**3.** IREA also raised the issue below that the Union engaged in delay tactics thereby supporting a finding that the parties had reached lawful impasse. On appeal, IREA argues that the evidence it presented concerning delay tactics should constitute waiver by the Union on the issue of medical and dental insurance premiums. Neither the ALJ nor the Board credited this evidence below, and we agree that the record is insufficient to support a finding of intentional delay on the part of the Union.

## II.

IREA challenges the Board's finding that it unlawfully changed the method of calculating eligibility for overtime pay upon expiration of the Agreement. IREA challenges the Board's finding on two grounds: (1) that because the right to pay overtime based upon hours worked was incorporated into the Agreement, IREA's exercise of that right following the expiration of the Agreement did not change the status quo, and (2) even if payment of overtime based on hours worked did amount to a change in the status quo, the union waived its right to bargain over the issue.

■ Although the expired written contract usually defines the status quo, for purposes of determining whether a unilateral change has occurred prior to lawful impasse, an uninterrupted and accepted custom may become an implied term and condition of employment by mutual consent of the parties. *See Riverside Cement Co.*, 296 N.L.R.B. No. 104, slip. op. at 6–7 (Sept. 29, 1989). *See also Bodie v. City of Columbia*, 934 F.2d 561 (4th Cir.1991). Once an implied term is established, a unilateral change regarding the term is unlawful. *Riverside Cement Co.*, 296 N.L.R.B. No. 104, slip. op. at 6–7.

■ The record contains sufficient evidence in support of the Board's finding that IREA's use of paid time off as a basis for overtime pay was an implied term and condition of employment. IREA had a long-standing policy of using paid time off as a basis for overtime pay. The practice continued even after the 1980 contract modification which entitled IREA to pay overtime based solely on hours worked. By the critical time in this case—late 1988– early 1989—the practice had persisted for at least seven years after the contract language was changed. Moreover, the evidence establishes that the practice was uninterrupted and both IREA and the Union

consented to the arrangement.[4] As a result, IREA's implementation of the change in calculation of overtime pay is an unlawful unilateral change unless the Union waived its right to bargain over the issue.

■ The Board's finding that the Union did not waive its right to bargain over calculation of overtime eligibility is supported by substantial evidence in the record as a whole. IREA implemented the unilateral change in calculation of overtime eligibility without notifying the Union. The first time the issue was discussed at a negotiation session was on December 21, 1988, at which time IREA notified the Union that IREA had been crediting paid time off in error and now the error was corrected. In other words, the Union was again presented with a done deal or fait accompli. Since the change had already been implemented before the Union was given notice of the proposed change, it had no opportunity to request bargaining about this issue. *See NLRB v. Walker Const. Co.*, 928 F.2d 695, 696–97 (5th Cir.1991). Further, as with the medical and dental insurance premium issue, the fact that IREA presented the overtime pay calculation issue as a fait accompli reasonably led the Union to believe that further attempts at bargaining would be futile. Because IREA presented the issue to the Union as a predetermined plan, the Union's failure to request bargaining is not tantamount to a waiver. *Keystone Steel & Wire*, 309 N.L.R.B. No. 31, slip. op. at 16–17 (Oct. 22, 1992). For these reasons, we uphold the Board's findings that there was no Union waiver and that IREA, by unilaterally changing the status quo, violated 29 U.S.C. § 158(a)(1) and (5).

## III.

Finally, IREA challenges the Board's finding that IREA unilaterally implemented terms and conditions of its final bargaining proposal without having reached a valid bargaining impasse, in violation of 29 U.S.C. § 158(a)(1) and (5). IREA argues that there is no evidence of subjective bad faith on the part of IREA, that the issues of management rights and seniority status were the sole causes of impasse, and that substantial evidence in the record considered as a whole does not support the Board's finding that IREA's unilateral changes interfered with the bargaining process thereby precluding the parties from reaching a valid impasse.

■ A bargaining impasse occurs when parties to a negotiation exhaust all possibility of reaching agreement and further negotiations would be futile. *Facet Enters., Inc. v. NLRB*, 907 F.2d 963, 975 (10th Cir.1990) (citation omitted). To determine whether parties have negotiated to good faith impasse, the Board traditionally considers (a) the parties' bargaining history, (b) the parties' good faith in negotiations, (c) the length of the negotiations, (d) the importance of the issues over which there is disagreement, and (e) the contemporaneous understanding of the parties as to the state of negotiations on the crucial date. *Taft Broadcasting Co.*, 163 N.L.R.B. 475 (1967). There is no "presumption that an employer's unfair labor practice automatically precludes the possibility of meaningful negotiations and prevents the parties from reaching good faith impasse." *NLRB v. Cauthorne*, 691 F.2d 1023, 1025 (D.C.Cir.1982). Rather, impasse is precluded if there is a causal connection between the employer's unremedied changes and

---

**4.** Although proposing "no change" in the overtime calculation contract provision which entitled IREA to exclude paid time off, IREA continued to manifest its consent to the prior arrangement. At the opening of negotiations, contrary to IREA's position in January 1988, IREA failed to raise the issue of calculation of overtime pay; rather, it merely included the issue with the other issues in which it sought "no change." By contrast, IREA did identify two other paragraphs in the overtime article in which it desired change and it specifically discussed them

with the Union. Additionally, IREA failed to respond to the Union's proposal in any way. Under these facts, it was reasonable for the Union to conclude that IREA had abandoned the idea of changing the established system of using paid time off as a basis for overtime pay. Therefore, when IREA failed to request bargaining on the issue, and the Union withdrew its proposal, the parties manifested mutual assent on continuing the existing term and condition of employment.

the subsequent deadlock in negotiations. *J.D. Lundsford Plumbing*, 254 N.L.R.B. 1360 (1981), *enf'd sub nom. Sheet Metal Workers Local 9 v. NLRB*, 684 F.2d 1033 (D.C.Cir.1982). However, the Board may consider the effect of unilateral changes on the bargaining process itself, *La Porte Transit Co., Inc. v. NLRB*, 888 F.2d 1182, 1186 (7th Cir.1989), and likewise may consider the issue of employer good faith in light of such unilateral changes. *Cauthorne*, 691 F.2d at 1026 n. 5. Lastly, we note that whether impasse occurs is a question of fact particularly suited to the Board's expertise. *La Porte Transit Co., Inc.*, 888 F.2d at 1187.

We determine that the Board's reliance on the likelihood that the Union lost the trust of its employees due to the economic impact of IREA's unilateral changes is speculative; however, we uphold the Board's determination that valid impasse was not possible on March 20, 1989 due to the fact that IREA's unilateral changes negatively impacted the bargaining arena. First, we note that IREA implemented three unilateral changes while negotiations were still ongoing. As a result, the Board is justified in considering the effect of these changes on the overall negotiations. *La Porte Transit Co., Inc.*, 888 F.2d at 1186. Additionally, while there has been no allegation of subjective bad faith on the part of IREA, an employer's good faith is called into question when it acts unilaterally while negotiations are ongoing. *Id.* at 1187. Further, the Supreme Court, in *NLRB v. Katz*, 369 U.S. 736, 747, 82 S.Ct. 1107, 1113, 8 L.Ed.2d 230 (1962), applied an objective test in determining that employer unilateral action violates 29 U.S.C. § 158(a)(5) regardless of overall subjective bad faith. In *Katz*, the Court explained that unilateral action taken by an employer without prior discussion with the union "must of necessity obstruct bargaining...." *Id.* This is especially true where, as here, in the midst of ongoing negotiations, the employer implements three serious unilateral changes, two of which—eligibility for overtime and method of selecting employees for overtime—are implemented prior to notifying the Union.

Under these circumstances, despite the lack of allegations of IREA subjective bad faith, the record supports the Board's conclusion that IREA's unilateral action adversely affected the bargaining process.

In light of the Board's determination that the *bargaining arena itself* was adversely affected by IREA's unilateral action, the fact that the major topics over which the parties continued to disagree on March 20, 1989 did not involve the same topics which were the subjects of the unilateral changes is of little import. The ALJ found that the major topics separating the parties on March 20, 1989—management rights and seniority status—had no relation to the topic involved in a unilateral change—i.e., the method of selecting employees for overtime. While we agree with the ALJ on this point, we hold that this does not defeat a finding of a causal connection between IREA's three unilateral changes and the subsequent deadlock in negotiations. In this case, the record supports the Board's conclusion that the bargaining process itself was adversely affected by IREA's unilateral action, and it is therefore impossible to predict where the parties would have stood on the issues of management rights and seniority status on March 20, 1989, in the absence of the unilateral changes. As a result, we hold that a sufficient causal nexus exists and uphold the Board's finding that IREA, by declaring impasse and unilaterally imposing the terms of its final proposal violated 29 U.S.C. § 158(a)(1) and (5).

Accordingly, IREA's petition for review of the order by the National Labor Relations Board is DENIED. General Counsel's application for enforcement is GRANTED.