**UNITED STATES COURT OF APPEALS**

<u>**Filed 4/22/96**</u>

**TENTH CIRCUIT**

INTERMOUNTAIN RURAL ELECTRIC
ASSOCIATION,

       Petitioner/Cross-Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD,

       Respondent/Cross-Petitioner.

No. 95-9529
(Board Case No. 27-CA-10711)

**ORDER AND JUDGMENT**[*]

Before **PORFILIO**, **BARRETT**, and **LUCERO**, Circuit Judges.

These cross appeals raise issues relating to an award of
approximately $3,000 in backpay to two linemen who work for
Intermountain Rural Electric Association (the Company). The
remedy was generated after the National Labor Relations Board

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. This court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

found the Company violated section 8(a)(5) and (1) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(5) and (1), by unilaterally changing the procedure for selecting employees for overtime. ***Intermountain Rural Elec. Ass'n,*** 305 N.L.R.B. 783 (1991)(**IREA I),** *review denied, enforcement granted*, ***Intermountain Rural Elec. Ass'n v. NLRB,*** 984 F.2d 1562 (10th Cir. 1993)(**IREA II**). On its cross appeal, we enforce the Board's order.

The Company is a rural electric cooperative providing electrical services to customers in the area surrounding its facility in Sedalia, Colorado. The International Brotherhood of Electrical Workers, Local 111, AFL-CIO (the Union), represents the linemen, employees who construct, maintain and service the electrical lines. The Company and the Union have a longstanding collective bargaining agreement. Under that agreement, the Company called linemen for overtime work in inverse order of the total amount of overtime the employee had worked the prior year so that linemen who had worked the least hours would be called first by dispatchers. For the purpose of this case, linemen may be called for two types of overtime: **callout overtime** - employees are called to return to work during weekday evenings and nights in response to unforeseen emergencies such as power outages; and, **standby overtime** - linemen assigned to be "on call" during weekends and holidays earn two hours each day for being on call;

and, in case emergency work has to be performed and they are called, they earn additional standby overtime.  Callout overtime is not mandatory, and a lineman called may refuse the overtime assignment without penalty.

In practice, an overtime committee made up of employees oversaw the allocation of overtime.  Until the change in late 1988, the committee assigned callout and standby overtime at the beginning of each calendar year on the basis of seniority.  More senior employees could select the holidays and weekends they wanted to work and then swap schedules if they were later unable to work.

On December 14, 1988, however, during negotiations over a new  collective bargaining agreement, the Company announced it would instruct its dispatchers to use an alphabetical rotation procedure exclusively to schedule callout and standby overtime.  Then, when an emergency arose during the evening or on weekends, the dispatcher would call the next name alphabetically on the list.  Linemen could still refuse callout time, but the alphabet, not seniority, controlled standby overtime.

This unilateral change during the collective bargaining process was deemed an unfair bargaining practice in *IREA I*, and enforced in *IREA II*.  That finding carried with it a remedial order to restore the overtime procedures previously bargained for and for backpay to be awarded to specific employees who suffered

as a consequence of the unilateral change. The Company did not challenge either order. However, after the General Counsel submitted a Compliance Specification alleging the Company owed approximately $13,724 plus interest in backpay to four employees, the Company objected, contending it owed no money to any employee because of its change in overtime call procedures.

The issue was brought to trial before an administrative law judge upon the General Counsel's amended Compliance Specification which reduced the amount of backpay allegedly owed to $10,225.84. At the hearing, the General Counsel called Robert Cervone, an NLRB field examiner, who explained how he arrived at a "representative period" by including as potential backpay claimants all linemen who had been employed consistently for the three years prior to 1988 and at least into the first calendar quarter of 1991. Only overtime actually worked by those linemen was included in the backpay computations. The formula then compared the average percentage of total overtime hours each such lineman worked during that three-year period. It also compared the percentage of overtime worked before and after 1988. Mr. Cervone calculated the difference between the representative percentage and each quarterly percentage after the change, converting the difference into hours and multiplying by the overtime pay rate to determine the backpay owed. Given that the total number of overtime hours had not changed - the Company

still called linemen to approximately the same number of calls – Mr. Cervone could then determine how the new system impacted an employee's total number of overtime hours while also taking into consideration employees' refusing callout overtime.

After the hearing, however, the General Counsel submitted a brief to which he appended an amended calculation reducing the total amount of overtime he claimed was owed to $3,993.30. Unfortunately, the brief itself is not in the record before us; therefore, we cannot be certain of its contents. About those contents, however, the Board stated in its order:

> [T]he General Counsel took account of the Respondent's evidence concerning the similarly situated unit employees and, deleting the hours for employees Kogan and Keefe, recomputed the representative percentages and submitted these revised backpay figures to the judge.

Although the ALJ granted the General Counsel's request the record remain open to permit submission of rebuttal to the Company's expert, the General Counsel did not add any more evidence. He then moved to close the record. The Company filed no objection to the General Counsel's appended brief, nor did it attempt to otherwise object before the ALJ to its contents.

The ALJ dismissed the amended backpay specification, finding the General Counsel's posthearing attachments should be stricken from the record because they were not properly introduced; that this unfair labor practice did not warrant the usual presumption that backpay was owed; and the General

Counsel's formula to calculate backpay was not "reasonably designed to produce approximate awards due." The General Counsel took exception, and after briefing, the Board reversed the ALJ's decision.

The Board defined "the single backpay issue" before it as "the extent of the loss suffered by certain unit employees when [the Company] changed its procedure for selecting employees for callout overtime ... and standby overtime." The Board rejected the ALJ's characterization of the General Counsel's posthearing brief as an amended specification of new evidence, stating the attachments are recalculations of the backpay figures based on the evidence about the composition of the bargaining unit the Company submitted at the hearing. The Board stated this was not "new evidence" but an arithmetic adjustment in light of the record. This adjustment did not necessitate reopening the record, and the Company could hardly claim surprise or prejudice by having the General Counsel agree with one of its arguments.

Next, the Board disagreed with the ALJ's finding that the award of backpay for other unfair labor practices ascribed to the Company in this case negated the presumption of backpay in this instance. Reversing the ALJ, the Board held the unilateral action changing the callout system "created the potential loss of income to employees" which is distinct from other losses.

The Board found the Company did not carry its burden through the testimony of its expert, Dr. Bien.  The Board concluded this testimony did not "amount to an affirmative conclusion that the differences were not caused by the selection procedure change, so it does not rebut the presumption [requiring backpay awards.]"

Finally, the Board rejected the ALJ's conclusion the General Counsel's proposed formula was not reasonably calculated to correctly establish the losses at issue.  Had the Company not changed the procedure, the loss would not have ensued, the Board stated, permitting it to construe uncertainties against the wrongdoer.  **La Favorita, Inc.**, 313 N.L.R.B. 902 (1994), *review denied, enforcement granted*, 48 F.3d 1232 (10th Cir. Jan. 27, 1995) (unpublished disposition).  The Board found the General Counsel's formula adequately considered the vagaries of the voluntariness of overtime, and the three-year representative time period produced a "fairly accurate picture of the amount of overtime."  The Board rejected the ALJ's reliance on the hearsay testimony of Company supervisors, finding: "Such vague and speculative testimony is insufficient to defeat the presumption that backpay is due because of the unlawful reduction in offered overtime."  The Board also found the General Counsel's method took into account the technological changes that might have reduced the number of overtime hours available.  "By calculating

each employee's overtime during the backpay period as a percentage of the total available during that period, variance in the actual number of hours is taken into account." The Board did not fault the use of total types of overtime from which to calculate the specific losses. It noted the Company did not keep records compiling overtime by category and never suggested the General Counsel examine five and one-half years of employee time cards. "Because the [Company] was urging that callout and standby overtime did not constitute a substantial portion of the total [hours] worked, it was required to do more than gesture vaguely in the direction of thousands of employee timecards." Thus, the Board affirmed the award of $2,123.04 in backpay to Gerald Fedders and $1,870.26 to Mitchell Eveleth.

On appeal, the Company essentially argues because backpay was not calculated with absolute precision, the resulting award, arrived at after the hearing, amounts to a "penalty" imposed without due process. The backpay formula, it insists, arbitrarily and unreliably figured overtime based on factual inaccuracies, forcing the Company to pay employees for not working.

Nonetheless, because we must give considerable deference to the Board's construction of the National Labor Relations Act, **IREA II**, 984 F.2d at 1566, we must agree with the conclusions of the Board. Under the very deferential standard of review to

which the Board's judgments are entitled, its findings of fact must be upheld "if they are supported by substantial evidence in the record considered as a whole." **Monfort, Inc. v. NLRB**, 965 F.2d 1538, 1540 (10th Cir. 1992) (citing **Universal Camera Corp. v. NLRB**, 340 U.S. 474, 488 (1951)). In this review, we must consider both the findings of the ALJ and the Board, recognizing the wider experience and combined knowledge of the three members of the Board's panel. We stated in **Ann Lee Sportswear, Inc. v. NLRB**, 543 F.2d 739 (10th Cir. 1976), "The Board, of course, is not bound by the findings and conclusions of an Administrative Judge, and is free to draw its own inferences, as well as conclusions, when its broader experience and expertise indicates that such is in order." **Id.** at 743 (citations omitted). Moreover, while a Court of Appeals "might disagree with the Board's interpretation of the evidence in a given case, we are not free to substitute our view of the facts for the Board's when it is supported by some credible evidence in the record that is not outweighed by evidence opposed to the Board's view." **NLRB v. Cell Agric. Mfg. Co.**, 41 F.3d 389, 393-94 (8th Cir. 1994).

We stated in **Angle v. NLRB,** 683 F.2d 1296 (10th Cir. 1982):

> The purpose of a backpay order is to vindicate the public policy of the Act by making any employee whole for any losses suffered because of an employer's unfair labor practice. The Board's power to order backpay is a broad discretionary one, subject to limited judicial review.

*Id.* at 1301 (citations and quotation marks omitted).

A finding the employer has committed an unfair labor practice which creates a potential for loss "is presumptive proof that some backpay is owed by the employer." ***NLRB v. Mastro Plastics Corp.***, 354 F.2d 170, 178 (2d Cir. 1965), *cert. denied*, 384 U.S. 972 (1966). Moreover, it is the burden of the employer "to establish facts which would negative ... or ... mitigate that liability." ***NLRB v. Brown & Root, Inc.***, 311 F.2d 447, 454 (8th Cir. 1963). "We will not disturb a backpay order "'unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.'" ***88 Transit Lines, Inc. v. NLRB***, 55 F.3d 823, 825 (3d Cir. 1995) (quoting ***Fibreboard Paper Prod. Corp. v. NLRB***, 379 U.S. 203, 216 (1964) quoting ***Virginia Elec. & Power Co. v. NLRB***, 319 U.S. 533, 540 (1943)).

With these principles in mind, we briefly turn to the issues raised by the Company in this appeal. The Company contends the Board erred by reversing the ALJ's order striking the General Counsel's post-hearing brief. The Company offers several reasons for its position: (1) the new calculations were an attempt by the General Counsel to rehabilitate its only witness who had been discredited by the ALJ; (2) the amended

calculations have serious flaws the Company was unable to address on cross-examination; and, (3) even if the amended calculations "applied the correct data," they were based on faulty assumptions because no employee actually lost overtime work.

Second, the Company argues the backpay formula did not adequately take personal variables into account. The Company states when backpay was calculated by comparing the difference between the relative percentages of overtime worked before and after the change, the formula did not adequately consider employee refusals or unavailability or personal changes of any sort in responding to a callout. The Company points to testimony of Mr. Eveleth, one of the backpay awardees, that he would have been disinclined to accept overtime because of his increased family responsibilities during the period.[1] The Company also relies on a supervisor's testimony about the other employee, Mr. Fedder, and his overtime availability in support of its contention.[2]

Third, the Company challenges the General Counsel's lumping all overtime work together to make his computation. Finally,

---

[1] Later, however, Mr. Eveleth changed his opinion and stated he would probably have earned about ten percent of the figure the General Counsel's formula attributed to him.

[2] Yet, the Company does not explain why it did not call Mr. Fedder to testify. Nevertheless, it urges the Board improperly rejected this testimony as speculative hearsay.

the Company maintains, the formula did not consider: (1) the behavior of individual employees with respect to their ability or willingness to accept overtime; (2) callout procedures prior to December 1988; and (3) the number and identity of employees in a group of employees whose relative overtime was compared.

Having examined the record, we find nothing leading us to the conclusion the Company was deprived of due process. If we correctly understand the facts, the only purpose of the General Counsel's attachment to his brief was to lower the amount of backpay he claimed due to reflect the elimination of two employees from those eligible for compensation. This calculation was not based upon a theory new to the proceedings. Indeed, it was the formula over which the litigation occurred. We must uphold the Board's holding on this issue.

As for the remaining issues, we believe **88 Transit Lines** is particularly illuminative because it also involves a supplemental backpay proceeding following an order enforcing an earlier NLRB finding. In that case, the NLRB found the employer discriminated against its employees by unilaterally replacing the transit run schedule which had been in effect for many years with a new one that reduced the number of runs employees could work. In that case, too, the ALJ recommended amending the General Counsel's backpay calculation by not awarding backpay to fourteen replacement workers who had been hired during the

backpay period because they had no losses to be restored to them. It also recommended treating as interim earnings any amount by which post-unfair labor practice earnings exceeded employee earnings during the base-period year. The Board rejected both suggestions.

On appeal, the Third Circuit agreed, rejecting each of the Company's three claims of error, issues mirroring those before us here. The court rejected the Company's characterization of the award of backpay to the fourteen employees hired after the schedule change as punitive. 55 F.3d at 826. In our case, the Company asserts a similar argument, contending granting backpay to the two linemen who voluntarily refused some callout time based solely on applying the formula is a penalty. The Third Circuit, holding to the contrary, reasoned the change in schedule caused a loss of work for the entire bargaining unit. "The Board correctly found that the remedy was to inure to the benefit of the entire bargaining unit. The award of backpay to the fourteen replacement employees was not "'punitive or confiscatory'" and was "'reasonably adapted to the situation that call[ed] for the redress.'" *Id.* (citations omitted).

The employer's second argument about the duty of employee/discriminatees to mitigate damages and that gross backpay must be reduced by interim earnings to derive a net backpay award was also rejected. "It is true that mitigation

of loss of earnings is a cardinal principle in the development of remedial orders under the National Labor Relations Act." *Id.* at 826-27. However, the court continued, in that case, the excess was attributable to fluctuations in the amount of available work during the applicable time period rather than to the restoration of lost work by the employer. The Third Circuit observed: "The Company has provided us with no authority for its argument that it can avoid the payment of backpay liability for its discriminatory schedule change simply because discriminatees happened to do better financially during the backpay period than during the base-year period." *Id.* at 827. In our case, the Company takes a similar tack contending the two linemen have reaped a windfall by being paid for not working.

In sum, we find no support in the cases for the Company's assertion the change in overtime resulted in no backpay. We agree with the Third Circuit that the injury was to the bargaining unit, and the Company should not be able to profit from its unfair labor practice. A backpay award is only an approximation of what is owed. *See* **La Favorita**, 313 N.L.R.B. at 903. Thus, to urge the calculation is incorrect because it didn't properly account for the technological improvements or correspond to precise statistical principles is inapposite. The General Counsel's formula does not have to achieve perfection; it need only be non-arbitrary.

Having concluded the record contains substantial evidence supporting the conclusions of the Board, we then apply the rule of **Ann Lee Sportswear,** where we stated when it comes to crafting remedies, we should look to the expertise of the Board over that of an ALJ.  543 F.2d at 743.  The Board's "broader experience and expertise" are entitled to considerable weight.  *Id.*  Upon that basis, the Company's **PETITION FOR REVIEW IS DENIED,** and the Board's **ORDER is ENFORCED.**

**ENTERED FOR THE COURT**


**John C. Porfilio**
**Circuit Judge**