983 F.2d 240
 142 L.R.R.M. (BNA) 2177, 299 U.S.App.D.C.
215, 61 USLW 2484,
124 Lab.Cas. P 10,503
 UNITED STEELWORKERS OF AMERICA, AFL-CIO-CLC, LOCAL UNION
14534, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Concrete Pipe and Products Corp.--Syracuse Division, Intervenor,
CONCRETE PIPE AND PRODUCTS CORP.--SYRACUSE DIVISION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
United Steelworkers of America, AFL-CIO-CLC, Local Union
14534, Intervenor.
 Nos. 91-1496, 91-1513.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 9, 1992.
Decided Jan. 12, 1993.
As Amended April 8, 1993.
 
 Petitions for Review of an Order of the National Labor Relations Board.
 Rudolph L. Milasich, Jr., Pittsburgh, PA, for petitioner in No. 91-1496 and intervenor in No. 91-1513. Jeremiah Collins, Washington, DC, and Carl B. Frankel, Pittsburgh, PA, entered an appearance for United Steelworkers of America, AFL-CIO-CLC, Local Union 14534.
 James C. Hoover, Atlanta, GA, with whom Francis T. Coleman, Washington, DC, and Jon M. Gumbel, Atlanta, GA, were on the brief, for intervenor in No. 91-1496 and petitioner in No. 91-1513.
 Robert N. Herman, Atty., N.L.R.B., with whom Jerry M. Hunter, Gen. Counsel; Aileen A. Armstrong, Deputy Associate Gen. Counsel; and Charles Donnelly, Supervisory Atty., N.L.R.B., Washington, DC, were on the brief, for respondent.
 Before: WILLIAMS, SENTELLE, and RANDOLPH, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SENTELLE.
 SENTELLE, Circuit Judge:
 
 
 1
 We review a National Labor Relations Board ("NLRB") decision concerning relations between the United Steelworkers of America, Local 14534 ("Union") and the Concrete Pipe and Products Corp.--Syracuse Division ("Company"). The NLRB rejected the Union's allegations that the Company violated section 8(a)(5) and 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5) and (d) (1988) ("NLRA" or "Act"), by withholding financial information and failing to negotiate in good faith. The Union petitions for review of this aspect of the NLRB's decision, and the Company intervenes on the side of the NLRB. The NLRB also held that the Company violated section 8(a)(3) and (1) of the Act, 29 U.S.C. § 158(a)(3) and (1) (1988), unlawfully discriminating against the Union, by failing to recall the employees to vacancies which occurred after the striking Union made an unconditional offer to return to work. On this issue, the Company seeks review and the Union intervenes on the side of the NLRB. Because great deference is due to NLRB adjudicative decisions, and because the NLRB decision meets the necessary minimal standards of reasoned decision making, we affirm.
 
 I. INTRODUCTION
 A. Factual Background
 
 2
 The Company has operated a concrete pipe and manufacturing plant in Syracuse, New York for over forty years. For the past thirty years, there have been collective bargaining agreements between the Union and the Company covering production and maintenance employees at the plant. Before the most recent collective bargaining agreement expired at midnight, March 20, 1987, the parties negotiated for a new agreement for 21 hours in four sessions.
 
 
 3
 At the first meeting on March 10, company president Nicholas Melfi opened negotiations with a statement that included the following: "[T]o survive in today's market we have got to be able to be competitive, and to be competitive wage rates and benefits must be lowered. These are our contract proposals which we [b]elieve are necessary to accomplish what I have said." Joint Exhibits ("J.E.") at 190. The Company's proposal called for a 30% reduction in wages from a top rate of $9.41 to $6.50; a 50% reduction in vacations from four weeks to two weeks; a 50% reduction in its medical insurance premiums by requiring employees for the first time to pay half; and a 55% reduction in holidays from eleven to five.
 
 
 4
 The Union representative, George Prenatt, responded that Union policy on concessions was that, if the Company opened its books and showed a need, the Union would make concessions. Melfi flatly refused the request, stating "our company was a privately-held company, in fact, family-owned, and it was strictly against company policy to give anyone our books." NLRB Hearing Transcript ("Tr.") at 530-31, reprinted in J.E. at 734-35.
 
 
 5
 In subsequent negotiating sessions the Company and Union made minor progress on a number of issues such as the length of employees' probationary period, the length of time for grievance procedures, the length of time for schedule changes, Company provision of safety shoes, call-in penalties, funeral leave and vacation policy. During these meetings, the Union on several occasions renewed its request that the Company open its books. For example, at the third negotiating session, the Union's representative said, "if the company wanted concessions, open your books, and if they show that you're losing money, we'll give you the concessions you need." Tr. 603, J.E. 807. The Company responded by reiterating that opening the books was against Company policy.
 
 
 6
 At the fourth and final negotiating session, the Union again asked to see the Company books, and its representative said that the Union would be willing to make concessions to share the pain if the Company proved it needed them. At that time, the Union modified its wage increase request from 4% per year to an increase of $.40 in the first year, $.35 in the second year, and $.30 in the third year, and withdrew its proposals to increase shift premiums. The Company withdrew its proposals to reduce show up pay and to delete meal money, and offered to bring holidays up to seven days, and to restore the employee dental plan if the employees agreed to pay 50% of the total medical insurance premium.
 
 
 7
 The Company announced that it had made its last, best offer. The Union responded with further proposals. The Company repeated that it had made its final offer, and urged the Union representatives to take the offer to its membership. The Union countered again with more proposals, regarding sick days, holidays, and decreasing its requested wage increase to $.30 per year. The Company merely reiterated that its best proposal was on the table. The Union responded by offering a one-year extension of the existing agreement, but the Company made no response. At 6:00 p.m. the Company broke off negotiations, six hours before the contract expired. The Union membership met the next day and voted unanimously to reject the Company's offer.
 
 B. Procedural History
 
 8
 The Union filed a charge with the NLRB, alleging that the Company was unlawfully refusing to allow the Union to examine the Company's financial records and was engaging in unlawful surface bargaining in violation of section 8(a)(5) of the NLRA, 29 U.S.C. § 158(a)(5). Section 8(a)(5) states that it is an unfair labor practice ("ULP") for an employer "to refuse to bargain collectively with the representatives of his employees." Id. The Union and the Company entered into a Settlement Agreement, requiring the Company to make available appropriate financial records, but this Agreement was revoked after the Company refused to provide the Union with cost data.
 
 
 9
 Several months later, the Union filed an additional charge, alleging that the Company unlawfully refused to allow its striking employees to return to work after they had made an unconditional offer to return, in violation of section 8(a)(3) of the NLRA, which states that it is an ULP for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." Id.
 
 
 10
 On these consolidated complaints, the Administrative Law Judge ("ALJ") found: 1) the Company unlawfully refused to provide cost data; 2) the Company failed to bargain in good faith; 3) the Company's unfair labor practices had caused the strike; and 4) the Company discriminated against its employees on the basis of union membership by refusing to reinstate them after they unconditionally offered to return to work.
 
 
 11
 The NLRB reversed the ALJ in part, ruling that: 1) the Company had no obligation to provide financial data because the Company was merely claiming that it needed the concessions it demanded in order to be competitive, not that it was unable to pay more; 2) the Company had not failed to bargain in good faith; and 3) the strike was an economic rather than an unfair labor practice strike. The Board, however, held that the Company had unlawfully discriminated against employees based on union membership by failing to rehire the Union members as jobs became available after they unconditionally offered to return to work. The Union petitioned for review of the first three of these decisions; the Company sought review of the fourth.
 
 II. DISCUSSION
 A. The Cost Data
 
 12
 The first issue raised on this appeal is whether there is a reasonable basis for the NLRB's conclusion that the Company did not violate the NLRA by refusing to provide the Union with the requested cost data. Section 8(a)(5) and 8(d) of the Act requires employers to bargain in good faith with the representatives of their employees. 29 U.S.C. § 158(a)(5) and (d). This obligation includes the duty to provide information needed by the bargaining representative relevant to the proper performance of its duties. NLRB v. ACME Industrial Co., 385 U.S. 432, 435-36, 87 S.Ct. 565, 567-68, 17 L.Ed.2d 495 (1967).
 
 
 13
 There is no presumption of relevance when a union seeks access to financial information to test an employer's need for concessions on labor costs. The standard for determining whether an employer must provide financial information was explained in NLRB v. Truitt Mfg. Co., 351 U.S. 149, 153-54, 76 S.Ct. 753, 756, 100 L.Ed. 1027 (1956). There the Supreme Court stated that "a refusal to attempt to substantiate a claim of inability to pay increased wages may support a finding of a failure to bargain in good faith." Id. at 153, 76 S.Ct. at 756. The Court noted, however, that it did not hold "that in every case in which economic inability is raised as an argument against increased wages it automatically follows that the employees are entitled to substantiating evidence. Each case must turn upon its particular facts." Id. The Board determines whether a union is entitled to financial information based on whether the employer has asserted an inability to pay, or simply an unwillingness to pay. See Washington Materials, Inc., 276 N.L.R.B. 839, 840-41 (1985). A company is obliged to provide financial information only when it asserts an inability to pay, because this assertion is legitimately subject to verification.
 
 
 14
 The Union argues that the Company asserted an inability to pay when the Company president said concessions were needed in order to "be competitive" and "survive in today's market." The ALJ accepted the union's argument, holding that Truitt compelled the conclusion that Melfi's statement triggered a duty to disclose economic information. The Board disagreed, finding that "[t]he Respondent's assertions pertain only to declining market conditions attributable to competition from other businesses." Concrete Pipe and Prods. Corp.--Syracuse Div., 305 N.L.R.B. ----, 138 L.L.R.M. (BNA) 1185, 1186 (1991). We affirm the Board's decision.
 
 
 15
 The courts accord a very high degree of deference to administrative adjudications by the NLRB. When the NLRB concludes that no violation of the NLRA has occurred, that finding is upheld unless it "has no rational basis" or is "unsupported by substantial evidence." United Mine Workers of America, District 31 v. NLRB, 879 F.2d 939, 942 (D.C.Cir.1989) (internal citations omitted). It is not necessary that we agree that the Board reached the best outcome in order to sustain its decisions. The Board's findings of fact are "conclusive" when supported by substantial evidence on the record considered as a whole. See 29 U.S.C. § 160(e). The Supreme Court recently instructed that a decision of an agency such as the Board is to be reversed only when the record is "so compelling that no reasonable factfinder could fail to find" to the contrary. INS v. Elias-Zacarias, --- U.S. ----, ----, 112 S.Ct. 812, 817, 117 L.Ed.2d 38 (1992).
 
 
 16
 When the Board disagrees with the ALJ as to legal issues or derivative inferences made from the evidence, this Court's standard of review "is not modified in any way." Universal Camera Corp. v. NLRB, 340 U.S. 474, 496, 71 S.Ct. 456, 469, 95 L.Ed. 456 (1951). Accord, Sign and Pictorial Union Local 1175 v. NLRB, 419 F.2d 726, 734 (D.C.Cir.1969).
 
 
 17
 The Board at one time accepted the Union's argument that a plea of competitive disadvantage is the functional equivalent of a statement of inability to pay under the Truitt analysis. In rulings enforced by this Court and others, the Board frequently found that companies had committed unfair labor practices by refusing to back up competitive disadvantage claims with statistical data. See, e.g., United Steelworkers Local 5571 v. NLRB, 401 F.2d 434, 436 (D.C.Cir.1968), cert. denied, 395 U.S. 946, 89 S.Ct. 2020, 23 L.Ed.2d 465 (1969); NLRB v. Western Wirebound Box Co., 356 F.2d 88, 91 (9th Cir.1966); NLRB v. Taylor, 338 F.2d 1003 (5th Cir.1964) (per curiam).
 
 
 18
 Recently, however, the Board has adopted a more restrictive reading of the Truitt disclosure requirements. The Board's change of heart apparently resulted from NLRB v. Harvstone Mfg. Corp., 785 F.2d 570, 575-77 & nn. 4-6 (7th Cir.), cert. denied, 479 U.S. 821, 107 S.Ct. 88, 93 L.Ed.2d 41 (1986). The Seventh Circuit there refused to enforce a Board order imposing Truitt requirements in response to a claim of competitive disadvantage. In a subsequent case, the Board concluded that it would henceforth treat competitive disadvantage and inability to pay bargaining statements as analytically distinct. See Neilson Lithographing Co., 305 N.L.R.B. No. 90, slip op. at 3-5 (1991), aff'd sub nom. Graphic Communications Int'l Union, Local 508 v. NLRB, 977 F.2d 1168 (7th Cir.1992). In the intervening period, a number of other circuits had sided with the Harvstone court in its interpretation of the NLRA. See Facet Enters., Inc. v. NLRB, 907 F.2d 963, 980 (10th Cir.1990); Washington Materials, Inc. v. NLRB, 803 F.2d 1333, 1338-39 (4th Cir.1986).
 
 
 19
 An agency may alter its interpretation of substantive law so long as its new interpretation does not conflict with the statute, see, e.g., International Bh'd of Elec. Workers v. ICC, 862 F.2d 330, 337 (D.C.Cir.1988), and so long as the agency supplies a "reasoned analysis" for "changing its course." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). See also Greater Boston Television Corp. v. FCC, 444 F.2d 841, 852 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971). We join our sister circuits in concluding that the Board's new disclosure rules are a permissible reading of the broad terms of the NLRA. See, e.g., Facet Enters., 907 F.2d at 980-81; Harvstone, 785 F.2d at 575-77. The question whether the Board supplied a reasoned explanation for the change is stickier. The Board's decision in this case did not discuss or even acknowledge the conflict with its earlier rulings. See Concrete Pipe and Prods. Corp.--Syracuse Div., slip op. at 3-4, 305 N.L.R.B. at ----, 138 L.L.R.M. (BNA) at 1185-88. However, we find that the Board's opinion in Neilson Lithographing, issued just two months after the opinion here under review, supplies the needed reasoned analysis for the policy change. Given the Board's thorough analysis in that case, which the Seventh Circuit recently upheld, it would be a hollow exercise to remand so that the Board may append the same analysis to its opinion in this case.
 
 
 20
 We also reject the Union's suggestion that it was entitled to rely on such precedents as this Court's Local 5571 decision in steadfastly adhering to its bargaining position. The negotiations between the Union and Concrete Pipe took place twelve months after the Seventh Circuit issued its Harvstone decision requiring the Board to rethink its equation of competitive disadvantage and inability to pay statements. Under these circumstances, the Union could not reasonably have believed that its right to Company financial data was clear under settled Board precedent. In sum, we find the Board's conclusion that Concrete Pipe did not commit an unfair labor practice by refusing to disclose its financial data to be supported by substantial evidence.
 
 B. The Bargaining Impasse
 
 21
 The Union argues that there is no substantial evidence in the record to support the Board's finding that there was an impasse at the time the Company broke off negotiations, and further contends that the Company did not negotiate in good faith. The Union notes that negotiations lasted only 21 hours, over only four meetings, and maintains that the Board impermissibly ignored the ALJ's finding that Company president Melfi had become "rigid and unbending" by the close of the fourth session.
 
 
 22
 Section 8(d) of the NLRA requires parties in collective bargaining to "confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement." 29 U.S.C. § 158(d). This means that parties must "enter into discussions with an open mind and a sincere intention to reach an agreement consistent with the respective rights of the parties." Sign and Pictorial Union Local 1175 v. NLRB, 419 F.2d 726, 731 (D.C.Cir.1969). Section 8(d) provides, however, that the obligation to bargain in good faith "does not compel either party to agree to a proposal or require the making of a concession." 29 U.S.C. § 158(d). Thus, the Act does not require any party "to yield any position fairly maintained; 'firmness of a bargaining position does not constitute bad faith.' " 419 F.2d at 731 (internal citation omitted).
 
 
 23
 The Union argues that the Board's finding of an impasse should nevertheless be reversed for four reasons. First, the Union alleges the Board did not conduct the sort of intensive factual inquiry it was obliged to make. See Taft Broadcasting Co., 163 N.L.R.B. 475, 478 (1967) (holding that whether impasse exists rests upon fact-intensive inquiry into the bargaining history, the good faith of the negotiating parties, the length of negotiations, the importance of the issues about which there is disagreement, and the contemporaneous understanding of the parties as to the state of negotiations), enforced, American Fed'n of Television & Radio Artists v. NLRB, 395 F.2d 622, 627-30 (D.C.Cir.1968). Second, the Union argues that the Company failed to bargain in good faith when it cut off negotiations six hours before the contract expired; as support, the Union cites the obligation of employer and union representatives to "meet at reasonable times and confer in good faith" under section 8(d) of the NLRA, 29 U.S.C. § 158(d). Third, the Union points out that there had been substantial movement by the Union at the time the Company declared an impasse. See Teamsters Local 639 v. NLRB, 924 F.2d 1078, 1084 (D.C.Cir.1991) ("If either negotiating party remains willing to move further toward an agreement, an impasse cannot exist."). Fourth, the Union urges that the Board erred in basing its determination solely on one factor--the width of the gap between the parties on wages--rather than considering other relevant factors. See Reichold Chemicals, Inc., 288 N.L.R.B. 69 (1988) (articulating a number of factors for good faith bargaining).
 
 
 24
 We do not find these arguments weighty enough to overcome the deference we give Board determinations concerning impasse. In Dallas General Drivers Local 745, Teamsters v. NLRB, 355 F.2d 842, 844-45 (D.C.Cir.1966), this Court held:
 
 
 25
 Our scope of review confines us to determining whether there is an absence of substantial evidence to support the Board's finding; impasse is a question of fact involving the Board's presumed expert experience and knowledge of bargaining problems. The problem of deciding when further bargaining on an issue is futile is often difficult for the bargainers and is necessarily so for the Board. But in the whole complex of industrial relations few issues are less suited to appellate judicial appraisal than evaluation of bargaining processes or better suited to the expert experience of a board which deals constantly with such problems.
 
 
 26
 Accord Sign and Pictorial Union Local 1175 v. NLRB, 419 F.2d 726, 731 (D.C.Cir.1969) ("In each instance the degree of cooperation which a party must show is largely a matter for the Board's expertise." (internal citation omitted)).
 
 
 27
 We find the Board's decision unassailable under the substantial evidence standard. We note in particular that the NLRB correctly emphasized that the Union's request for the Company's books was crucial to negotiations. Indeed, the Union's position on this issue is in considerable tension with its position on the disclosure question. If the Union was unprepared to make anything close to the concessions the Company was demanding without seeing the Company's books and substantiating the Company's need for the concessions, then the Board's finding that the parties were at an impasse appears to be founded on substantial evidence. The Board reasonably concluded that under the circumstances which prevailed during the negotiations, the parties were deadlocked over wages and benefits and there was no likelihood that further negotiations would break that deadlock.
 
 
 28
 The Union's complaint that the bargaining record suggests a lack of willingness on the Company's part to make itself available for negotiations at reasonable times and places is equally unavailing. The record evidence does not reveal that either of the two parties was solely responsible for the fact that negotiations began only ten days before expiration of the existing agreement.
 
 
 29
 Finally, the Union's last minute offer to extend the current contract for another year does not in itself establish that the NLRB was in error in declaring the parties were at an impasse. Although this offer represented movement on the part of the Union of about $.50 per hour from its opening offer, the Company's proposal was still more than $3.00 below the current hourly wage. We conclude that the Board's finding of impasse was supported by substantial evidence, and therefore will not disturb that finding on appeal.
 
 C. Reinstatement
 
 30
 The Union argues that the Board incorrectly found that the employees were engaged in an economic strike rather than an unfair labor practice strike. The Union defends the ALJ's finding that the strike was a "direct result" of the Company's unlawful refusal to provide the requested cost data and its overall failure to bargain in good faith. We have deferred to the Board's determination that the Company was not obliged to provide the Union with the cost data, and that an impasse existed when the company called an end to negotiations. From these findings, it follows that the employees were economic rather than unfair labor practice strikers.
 
 
 31
 Unfair labor practice strikers are entitled to immediate reinstatement to their former jobs upon their unconditional offer to return. Economic strikers have more limited rights; they are entitled to reinstatement upon their unconditional offer to return to their positions only when their former positions or comparable positions become available. Corson and Gruman Co. v. NLRB, 899 F.2d 47, 50 (D.C.Cir.1990).
 
 
 32
 The Board nonetheless concluded that the Company violated section 8(a)(3) and (1) of the Act, 29 U.S.C. § 158(a)(3) and (1), by refusing to reinstate the strikers to the same or substantially equivalent jobs after the Union made its unconditional offer to return to work on their behalf. See NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 378, 88 S.Ct. 543, 546, 19 L.Ed.2d 614 (1976). The Board ordered the Company to cease and desist from the unfair labor practice of not accepting the Union's unconditional offer, and required the Company to offer economic strikers reinstatement either to any available former positions or to substantially equivalent positions that might have become available subsequent to the employees' unconditional offer to return to work, and to make the strikers whole for any losses they might have suffered as a result of the failure to reinstate them. Decision and Order of the National Labor Relations Board in Concrete Pipe and Products Corp.--Syracuse Division and United Steelworkers of America, AFL-CIO.CLC, Local Union 14534, 305 NLRB No. 21 (September 30, 1991), at 10-11.
 
 
 33
 The Company argues that the Board erred because the Union did not make an unconditional offer to return to work. According to the Company, the offer was not unconditional because "the strikers repeatedly stated to the Company that the only condition under which they would return was if they were all immediately reinstated." Concrete Pipe and Products Corporation's Petitioner's Brief at 12 (emphasis in original). The Board contends that the Union did not thereby render its offer conditional. See Soule Glass and Glazing Co. v. NLRB, 652 F.2d 1055, 1107 n. 47 (1st Cir.1981) (where a "union in good faith took the non-frivolous position that the strikers were unfair labor practice strikers, [its] group reinstatement demand ... does not make the request conditional simply because the union's legal theory is eventually held to be incorrect."). We need not, however, reach the merits on this issue.
 
 
 34
 In its original complaint, the Union asserted that, "[o]n or about July 30, 1987, the striking employees in the Union, through the Union, made a written unconditional offer to Respondent to return to work." Order Consolidating Cases, Consolidated Complaint and Notice of Hearing Dated October 30, 1987, 6 Joint Appendix ("J.A.") 11. The Company admitted the accuracy of this allegation in its answer to the complaint. Respondent's Answer to Consolidated Complaint Dated November 10, 1987, J.A. 18. In so doing, the Company took this issue out of the case. The Company's petition for review of the Board's determination that it committed an unfair labor practice by not reinstating the strikers under the standards for rehiring economic strikers is therefore denied.
 
 III.
 
 35
 For the foregoing reasons, the conclusions of the NLRB are affirmed and the petitions for review are denied.
 
 
 36
 So ordered.