19 F.3d 502
 145 L.R.R.M. (BNA) 2833, 128 Lab.Cas. P 11,116
 BORDEN, INC., Petitioner/Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent/Cross-Petitioner,
Local 222, International Brotherhood of Teamsters, AFL-CIO,
Intervenor/Petitioner.
 Nos. 92-9548, 92-9559.
 United States Court of Appeals,
Tenth Circuit.
 March 15, 1994.
Rehearing Denied April 18, 1994.
 
 Marilyn O'Rourke, Washington, DC (Frederick C. Havard, Supervisory Atty., with her on the brief), for respondent/cross-petitioner, N.L.R.B.
 William F. Schoeberlein, Harding & Ogborn, Denver, CO, (Keith King, Counsel, Borden, Inc., Columbus, OH, with him on the brief), for petitioner/cross-respondent, Borden, Inc.
 Stephen W. Cook, Cook & Davis, Salt Lake City, UT, for petitioner, Local 222, Intern. Broth. of Teamsters, AFL-CIO.
 Before McKAY, HOLLOWAY, and GARTH,* Circuit Judges.
 GARTH, Senior Circuit Judge.
 
 
 1
 Both Local 222, International Brotherhood of Teamsters, AFL-CIO ("Union") and Borden, Inc. ("Borden") have petitioned for review of an order entered by the National Labor Relations Board ("Board") on July 31, 1992. The Board has cross-petitioned for enforcement of its order.
 
 
 2
 * A.
 
 
 3
 The order promulgated by the Board held that Borden had violated: 1) section 8(a)(5) of the National Labor Relations Act (the "Act") by unilaterally changing the terms and conditions of employment of employees transferred from Borden's Meadow Gold facility to its Farmer Jack facility and compensating them at the Farmer Jack wage rates; 2) section 8(a)(3) of the Act by constructively discharging those Meadow Gold employees who declined employment at Farmer Jack rather than accept lower wages at Farmer Jack; 3) section 8(a)(5) of the Act by promising Meadow Gold employees increased benefits if they abandoned the Union; and 4) section 8(a)(5) of the Act by threatening to lay off or refusing to transfer Meadow Gold employees unless the Union accepted Borden's last bargaining offer.
 
 
 4
 The Union contends that the Board erred in finding that a new unit was created following the consolidation of Borden's Farmer Jack and Meadow Gold dairy facilities and that the Board should have required Borden to apply the Meadow Gold collective bargaining agreement ("CBA") to the consolidated Farmer Jack facility under accepted principles of accretion. Borden argues that, after bargaining in good faith to impasse, it lawfully implemented the Farmer Jack terms and conditions of employment with respect to the transferred Meadow Gold employees.
 
 
 5
 Borden and the Union both challenge the Board's application of a rule requiring Borden to maintain separate terms and conditions of employment with respect to employees transferred from the Meadow Gold facility to the Farmer Jack facility, pending negotiation of a new CBA covering all of the employees at the Farmer Jack plant.
 
 
 6
 The Board seeks enforcement of its July 31, 1992 order.
 
 B.
 
 7
 We have jurisdiction over the parties' petitions for review pursuant to Sec. 10(f) of the Act, 29 U.S.C. Sec. 160(f), and over the Board's cross-application for enforcement pursuant to Sec. 10(e) of the Act, 29 U.S.C. Sec. 160(e). We will deny both Borden's and the Union's petitions for review and we will grant the Board's cross-application for enforcement of its July 31, 1992 order.
 
 II
 
 8
 Before reaching the merits of the parties' arguments, we briefly summarize the events giving rise to the present litigation, and the procedural path the Union's original complaint has followed on its way to this court. As counsel noted at oral argument, the facts in this case are, for the most part, undisputed. Only the consequences that should attach to those facts are at issue.
 
 A.
 
 9
 This matter arose out of three unfair labor practices charges lodged by the Union with the National Labor Relations Board concerning events which commenced in the fall of 1986.
 
 
 10
 On or about October 9, 1986, Borden purchased Beatrice, Inc.'s Meadow Gold dairy plant in Salt Lake City, Utah from Kohlberg, Kravis and Roberts, an investment firm that had acquired Beatrice and was selling off its assets. Borden replaced Beatrice in on-going labor negotiations with the Teamsters union representing the Meadow Gold employees, and eventually reached agreement with the Union on a CBA covering the period from May 1, 1987 through November 1, 1990.
 
 
 11
 On or about November 7, 1987, Borden purchased the Farmer Jack facility, another Salt Lake City dairy plant, from Borman Acquisition Group ("Borman"). The Farmer Jack employees were also represented by the Union, which had negotiated a CBA with Borman covering the period April 10, 1987 through April 30, 1992. From Borden's point of view, the terms of the Borman CBA were more favorable to the company than those contained in the recently negotiated Meadow Gold CBA.
 
 
 12
 On November 10, 1987, Borden officials met with Union representatives and confirmed its acquisition of the Farmer Jack plant, its recognition of the Union, its intention to assume and apply the Borman CBA, and its intention to consolidate the Meadow Gold and Farmer Jack operations at the Farmer Jack facility. On November 12, 1987, the Union sent Borden a letter requesting that the parties meet to negotiate the wages and working conditions of all employees at the Meadow Gold and Farmer Jack facilities. The Union's letter also requested that "the present Farmer Jack Labor Agreement not be unilaterally altered by [Borden] pending completion of these negotiations."
 
 
 13
 In January 1988, Borden and the Union began negotiating in earnest over a new labor contract covering the Farmer Jack facility and mutually acceptable terms for transferring Meadow Gold employees to the Farmer Jack plant. They were unable to reach agreement.
 
 
 14
 In February 1988, Borden held two direct meetings with Meadow Gold employees at which it informed the employees that its last offer to the Union, on January 13, 1988, was final and that failure to reach agreement on it would leave Borden with no choice but to lay off the employees at Meadow Gold and to "hire from the street" at Farmer Jack. Borden and the Union met again in March, May, and October 1988 without success.
 
 
 15
 On or about October 7, 1988, Borden ceased production at the Meadow Gold facility. Meadow Gold employees either were laid off or took early retirement. Borden, however, selectively "rehired" a number of the Meadow Gold employees to work at the Farmer Jack plant at their same or similar jobs. Borden applied the Farmer Jack contract to all of the Farmer Jack workers, including the former Meadow Gold employees.[1]
 
 
 16
 During this period--on February 26, March 11, and April 7, 1988--the Union filed a series of complaints against Borden alleging unfair labor practices in violation of the National Labor Relations Act Sec. 8(a)(1) (interfering, restraining, or coercing employees in the exercise of their rights), Sec. 8(a)(3) (using discriminatory hiring or labor practices to encourage or discourage union membership), and Sec. 8(a)(5) (refusing to bargain collectively with employee representatives).[2] The Union's complaints ultimately were consolidated by order of the Board on June 15, 1989.[3]
 
 B.
 
 17
 The Union's consolidated complaint initially was heard before an Administrative Law Judge ("ALJ") in September 1989. The ALJ ruled that the Borden had committed unfair labor practices in violation of Sec. 8(a)(5) of the Act by making impermissible promises to Meadow Gold clerical employees of increased benefits and wages if they abandoned the Union and the Meadow Gold CBA, and by improperly attempting to bargain with the Union by exerting pressure directly on Meadow Gold employees.
 
 
 18
 The ALJ found that the Farmer Jack negotiating unit could stand alone as a separate bargaining unit as of the time of acquisition and that, therefore, when the two plants were consolidated, Farmer Jack was neither an accretion to, nor a relocation of, the Meadow Gold unit. Rather, the ALJ found that the Meadow Gold employees had, in effect, been transferred to the Farmer Jack plant and that, upon consolidation, the separate units of dairy production employees became a single unit, different and independent from the two pre-existing units.
 
 
 19
 The ALJ also found that the Union, in its November 12, 1988 letter to the company, consented to Borden's application of the Borman CBA at the Farmer Jack plant, pending the negotiation of a new labor contract. Consequently, the ALJ held that the Union's claim that Borden committed an unfair labor practice by unilaterally assuming the Borman CBA was unfounded.
 
 
 20
 Finally, the ALJ found that the Union had not consented to Borden's implementation of the Borman CBA with respect to the transferred Meadow Gold employees upon consolidation of the two dairy plants. Nor was the Borman CBA instituted by Borden pursuant to an impasse in negotiations since, according to the ALJ, Borden's "implementation of the [Borman] contract was a course of conduct undertaken from the time of its acquisition of the [Farmer Jack] facility and was not initiated after some later argued impasse in bargaining." The ALJ ruled, however, that Borden was not legally obligated to maintain the Meadow Gold terms and conditions of employment and that, therefore, Borden had not committed and unfair labor practice by unilaterally changing the terms and conditions of employment of the transferred Meadow Gold employees.
 
 C.
 
 21
 The General Counsel, Borden, and the Union filed exceptions to the ALJ's decision with the National Labor Relations Board. The Board affirmed the ALJ's rulings, findings, and conclusions, subject to one major modification.
 
 
 22
 The Board found that Borden had presented no justification for unilaterally terminating the Meadow Gold employees' terms and conditions of employment. The Board held that Borden was, in fact, obligated to preserve the Meadow Gold CBA with respect to the transferred Meadow Gold employees while the parties bargained in good faith to agreement or impasse over a new CBA covering the consolidated unit.
 
 
 23
 Consequently, the Board upheld paragraph 12(b) of the Union's complaint, finding that Borden had violated Sec. 8(a)(5) of the Act by unilaterally changing the terms and conditions of employment of the Meadow Gold employees. The Board also reversed the ALJ's dismissal of paragraph 6 of the Union's complaint, finding that as a result of Borden's unilateral application of the Farmer Jack CBA to the Meadow Gold employees, those Meadow Gold employees who retired, rather than accept reduced benefits at Farmer Jack, were constructively discharged from their jobs in violation of Sec. 8(a)(3) of the Act.
 
 D.
 
 24
 Borden seeks review of the Board's order requiring it to apply the Meadow Gold terms and conditions of employment to the former Meadow Gold employees, and the Farmer Jack terms and conditions of employment to the Farmer Jack employees, pending the negotiation of a new agreement covering the consolidated Farmer Jack operations.
 
 
 25
 The Union seeks review of the ALJ's and the Board's findings that the Farmer Jack employees were not accreted into the Meadow Gold negotiating unit, that Borden had negotiated in good faith with the Union, and that the Union had consented to Borden's assumption of the Borman CBA when the company acquired the Farmer Jack facility in November 1987.
 
 
 26
 The Board cross-appeals for enforcement of its order. The Board seeks summary enforcement of its uncontested findings that Borden committed unfair labor practices by attempting to deal directly with, by making material misrepresentations to, and by threatening to lay off or refuse to transfer, Meadow Gold unit employees. See Intermountain Rural Electric Association v. N.L.R.B., 732 F.2d 754, 756 (10th Cir.1984) (granting summary enforcement of Board's uncontested findings).
 
 E.
 
 27
 As always, it is helpful for us first to delineate the standard we apply in reviewing the decisions of the Board and ALJ. See generally Intermountain Rural Electric Association v. N.L.R.B., 984 F.2d 1562, 1566 (10th Cir.1993).
 
 
 28
 The Board's findings of fact are conclusive when supported by substantial evidence in the record considered as a whole. Monfort, Inc. v. N.L.R.B., 965 F.2d 1538, 1540 (10th Cir.1992); United Steelworkers of America, AFL-CIO-CLC, Local Union 14534 v. N.L.R.B., 983 F.2d 240, 244 (D.C.Cir.1993). Where the Board's resolution of conflicting interpretations of the National Labor Relations Act is defensible, it is entitled to considerable deference. N.L.R.B. v. Viola Industries-Elevator Division, Inc., 979 F.2d 1384, 1391 (10th Cir.1992). That is, if the Board's application of a rationale rule is supported by substantial evidence, we will enforce its order. Central Soya Co., Inc. v. N.L.R.B., 867 F.2d 1245, 1247 (10th Cir.1988). When the ALJ and the Board have reached contrary conclusions, our standard of review remains the same. Intermountain Rural Electric Association v. N.L.R.B., 984 F.2d at 1566 (10th Cir.1993).
 
 III
 
 29
 At the outset, we can dispose of both Borden and the Union's objections to the Board's determination with respect to transfer and accretion. The Union argues that the Board erred in finding that a new negotiating unit was created upon the consolidation of the Farmer Jack and Meadow Gold plants. It claims that the Farmer Jack employees accreted into the Meadow Gold negotiating unit and that, therefore, the Meadow Gold CBA should apply to all employees. Borden argues that the Board erred in finding that the former Meadow Gold employees had been "transferred" to the Farmer Jack plant. It claims that the Meadow Gold employees were, in fact, "new hires," and that, therefore, the Borman CBA should apply to all employees.
 
 A.
 
 30
 In Central Soya Co., Inc. v. N.L.R.B., 867 F.2d 1245 (10th Cir.1988), we noted that when new employees "share a 'community of interest' with unit employees and have no separate identity, they are then properly accreted into the [extant] bargaining unit and governed by its selected representative." Id. at 1248 (upholding Board's accretion and unfair labor practice findings where company withdrew recognition of existing bargaining unit of unionized employees that was consolidated with non-unionized employees at newly acquired facility). Conversely, where employees have a separate identity, or lack a community of interest, accretion is inappropriate. As we recognized in Central Soya, "[t]he determination of whether a group of employees should be accreted into a bargaining unit involves the discretion of the Board, and that determination will not be set aside unless the Board has acted in an arbitrary and capricious manner." Id. at 1247.
 
 
 31
 Here, the Board explicitly adopted the ALJ's finding that "the Farmer Jack unit could stand alone as a separate bargaining unit as of the time of acquisition" and should not be accreted into the Meadow Gold negotiating unit. The ALJ based his decision on the fact that the Farmer Jack unit was "an existing operation which had been owned by two previous entities and was taken over by [Borden] as an independent operating facility with all its equipment, supervisory staff, markets and procedures in place and operating." Such an entity, the ALJ found, was capable of existing independently as a separate bargaining unit.
 
 
 32
 Despite the Union's charges to the contrary, the ALJ's reasoned determination that Farmer Jack was capable of operating independently of the Meadow Gold facility was supported by the overwhelming weight of the evidence. Farmer Jack was, in fact, operated independently by Borman prior to its acquisition by Borden. The Union's allegation that the ALJ's characterization of the Farmer Jack operation was in error, or an abuse of discretion, is without foundation.
 
 B.
 
 33
 In addition, the Board's and the ALJ's finding that Borden's lay off and rehiring of Meadow Gold employees was "tantamount to a transfer" is buttressed by the evidence presented by the parties. Borden does not deny that it rehired Meadow Gold employees. The company merely claims that its action cannot be categorized as a "transfer" since the terms of the Meadow Gold CBA did not provide for the transfer of employees.
 
 
 34
 Nevertheless, the Union clearly established, and the ALJ found, that Borden had solicited its former Meadow Gold employees to work at Farmer Jack, informed them of the requisite procedures for obtaining a position, and had them resume work at Farmer Jack, in the same or similar positions, virtually without any time missed.
 
 
 35
 Notwithstanding Borden's claim that it was not legally obliged to transfer the Meadow Gold employees to the Farmer Jack plant, the fact remains that Borden did engage those employees. The ALJ and the Board's decisions classifying Borden's actions as a "transfer" were supported by substantial evidence and will be upheld.IV
 
 
 36
 The Board's decision to compel Borden to apply bifurcated terms and conditions of employment at the Farmer Jack facility pending the negotiation of a new CBA presents a somewhat thornier problem.
 
 A.
 
 37
 Borden argues that the Board erred in requiring it to maintain the Meadow Gold CBA with respect to the former Meadow Gold employees, pending negotiation of new terms and conditions of employment covering all the employees at the consolidated Farmer Jack facility. Conversely, the Union argues that the Board should have ordered Borden to apply the Meadow Gold CBA to all of the workers at Farmer Jack facility. We are not persuaded by the arguments of either party.
 
 
 38
 The facts of this case appear to present a question of first impression: where, by reason of a reorganization, an employer consolidates the operations of formerly independent facilities, the employees of which are represented by the same union but covered by different CBA's, can the terms and conditions of employment as provided in each of the CBA's entered into by the company prior to the consolidation apply to each of the components of the new entity, pending negotiation of a new CBA which would cover all the employees of the new entity?
 
 1.
 
 39
 Borden points to the line of "accretion" and "relocation" cases previously advanced by the Union and argues that the overriding principle in those cases--i.e., application of the same conditions of employment to all employees consolidated in a relocated unit--should apply in the present context as well. Borden relies quite heavily on the Supreme Court's decision in N.L.R.B. v. Burns International Security Services., Inc., 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972).
 
 
 40
 In Burns, Burns had taken over the security duties for Lockheed Aircraft from Wackenhut Corporation and, in the process, hired a majority of Wackenhut guards. The Court held that while a successor employer is obligated to recognize and bargain with an incumbent (i.e., Wackenhut) union, it is not bound by the substantive provisions of a CBA negotiated by the employer's predecessor to which the new employer did not consent.
 
 
 41
 Borden argues that the "upshot" of the Burns opinion is that because Burns was not bound to maintain separate terms and conditions of employment for the Wackenhut group and the Burns group of employees, Borden should not have to maintain separate terms and conditions of employment as to both the Meadow Gold employees and the Farmer Jack employees. We, however, find Burns inapposite.
 
 
 42
 Borden, in fact, had an opportunity to renounce the CBA's negotiated by its predecessors, Beatrice and Borman, when it first acquired Meadow Gold and Farmer Jack. Borden, however, chose to negotiate a new CBA with the Meadow Gold employees, and it eagerly assumed the Borman contract with respect to the Farmer Jack employees. Borden fails to call our attention to any case in which an employer who had engaged in a corporate reorganization was released from a CBA it had negotiated itself, or to which it had consented.
 
 2.
 
 43
 The Board directs us to a number of analogous cases in support of its position that each plant's terms and conditions of employment should remain applicable to its respective employees at Farmer Jack pending the negotiation of a new CBA.
 
 
 44
 In Federal-Mogul Corporation, 209 N.L.R.B. 343 (1974), 140 non-unionized setup men, who were specifically excluded from the CBA between the company and its 2,000 unionized machine workers, voted to join the union. The company proceeded unilaterally to apply the terms of the CBA to the setup men. The Board held that, in so doing, the company had committed an unfair labor practice. The Board stated that it did "not perceive either logical or practical justification for permitting either party to escape its normal bargaining obligation upon the theory that this newly added group must somehow be automatically bound to terms of a contract which, by its very terms, excluded them." See also Wells Fargo Armored Service Corp., 300 N.L.R.B. 1104 (1990) (holding new union members do not come automatically under terms of CBA covering old union members).
 
 
 45
 Likewise, in Bay Medical, Inc., 239 N.L.R.B. 731 (1978), the Board held that where the corporate owner of two hospitals had been obligated to negotiate with nurses from two hospitals as individual units, the unrepresented nurses from one hospital could not be deemed to come automatically under the terms of the existing CBA covering the represented nurses at the second hospital when the former chose to join the latter in a single bargaining unit.
 
 
 46
 We observed in Intermountain Rural Electric Association v. N.L.R.B., 984 F.2d at 1566 (10th Cir.1993), that once a CBA expires, an "employer is obligated to maintain the status quo unless and until a new agreement is reached or the parties negotiate in good faith to impasse." To allow a company to renounce terms and conditions of employment it had negotiated itself would encourage companies to reorganize and consolidate for the sole purpose of relieving themselves of onerous CBA's. Such an incentive would be contrary to the overriding purpose of the National Labor Relations Act, i.e., that employers and employees should bargain with each other over terms and conditions of employment. 29 U.S.C. Sec. 141. See, e.g., Ford Motor Co. v. N.L.R.B., 441 U.S. 488, 498, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979).
 
 3.
 
 47
 The Union's solution, that the Meadow Gold CBA should be applied to all of Borden's employees, is no more satisfying than that proposed by the company. The Union, no less than Borden, is obliged to abide by the terms of the existing CBA until the parties negotiate a new labor agreement.
 
 
 48
 Notwithstanding the parties' other contentions, discussed below, the Board's solution--to maintain the status quo and hold Borden to the terms of the CBA's to which it had voluntarily agreed--neatly balances the interests of the employer, the employees, and the National Labor Relations Act.
 
 
 49
 Borden's allegation that the maintenance of two separate terms and conditions of employment is unworkable in practice, is not convincing. We recognize that the solution proposed by the Board, and affirmed by us today, will create a less-than-ideal situation. As the Board noted, however, rather than promote industrial unrest, experience suggests that this bifurcated status quo "is more likely to prompt both parties to negotiate an agreement expeditiously."
 
 B.
 
 50
 Borden argues that the Board erred in applying its bifurcation rule retroactively inasmuch as, according to Borden, the Board's ruling represents a departure from the rule we stated in Central Soya Co., Inc. v. N.L.R.B., 867 F.2d 1245 (10th Cir.1988) (holding in accretion case that representation rights follow the majority of employees). The Board answers that the instant case merely involves a unique factual situation and that, therefore, Borden's contentions with respect to the Board's retroactive application of a "new" rule are without merit.
 
 
 51
 We agree that the question of retroactivity does not arise in the present case. The Board has not overruled any controlling precedent upon which Borden relied to its detriment. We noted above that Central Soya, an accretion case, simply is inapposite. There was never any legal justification for Borden's application of the Borman contract to the Meadow Gold employees. The Board's order merely recognizes this fact.
 
 
 52
 In any event, even if retroactivity were implicated here, which we hold it was not, Borden has failed to persuade us that the Board's order should not be applied retroactively. The Supreme Court has recognized that "problems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule." S.E.C. v. Chenery Corp., 332 U.S. 194, 202, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947). In Chenery, the Court held as follows:
 
 
 53
 [W]e refuse to say that the [S.E.C.], which has not previously been confronted with the problem of management trading during reorganization, was forbidden from ... announcing and applying a new standard of conduct. That such action might have a retroactive effect was not necessarily fatal to its validity. Every case of first impression has a retroactive effect, whether the new principle is announced by a court or by an administrative agency. But such retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles. If that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law.
 
 
 54
 Id. at 203, 67 S.Ct. at 1580.
 
 
 55
 We have adopted a five-factor balancing test to determine whether an agency's ruling should be applied retroactively. Stewart Capital Corp. v. Andrus, 701 F.2d 846 (10th Cir.1983); Southwestern Public Service Co. v. Federal Energy Regulatory Commission, 842 F.2d 1204, 1208-1209 (10th Cir.1988). Those factors are as follows:
 
 
 56
 1. Whether the case is one of first impression;
 
 
 57
 2. Whether the new rule is an abrupt departure from well-established practice or merely an attempt to fill a void in an unsettled area of law;
 
 
 58
 3. Whether and to what extent the party against whom the new rule is applied relied on the former rule;
 
 
 59
 4. Whether and to what extent the retroactive order imposes a burden on a party; and
 
 
 60
 5. Whether and to what extent there is a statutory interest in applying a new rule despite reliance of a party on an old standard.
 
 
 61
 Balancing these five factors, we find Borden's arguments unpersuasive.
 
 
 62
 We agree that this case presents quite a novel set of circumstances and, accordingly, rightfully is classified as one of first impression (factor one). Nevertheless, the Board's ruling clearly was an attempt to fill a void created by the unprecedented factual situation presented by this case, and was not an abrupt departure from well-established practice (factor two).
 
 
 63
 The relevant general principles of law are well established. Employers and employees are required to abide by labor agreements to which they have agreed or consented. When a collective bargaining agreement expires, an employer is required to maintain the status quo until a new agreement is reached. Intermountain Rural Electric Association v. N.L.R.B., 984 F.2d at 1566 (10th Cir.1993). Inasmuch as there was no "former" rule which would have allowed Borden unilaterally to implement the Borman CBA with respect to the Meadow Gold employees, Borden's claim that it relied on an "old standard" to its detriment rings hollow (factor three).
 
 
 64
 In addition, since Borden itself negotiated the Meadow Gold CBA after acquiring the Meadow Gold facility from Beatrice, we would not be imposing any great burden on the company by compelling it to fulfill the terms of that contract, pending negotiations of a new agreement (factor four). See N.L.R.B. v. Viola Industries-Elevator Division, Inc., 979 F.2d 1384, 1396 (10th Cir.1992) (en banc); International Association of Bridge, Structural & Ornamental Iron Workers, Local 3 v. N.L.R.B., 843 F.2d 770, 781 (3d Cir.1988).
 
 
 65
 Finally, Borden fails to note that the burden of this bifurcated status falls equally upon the shoulders of the Union. They too have petitioned this court to adopt a rule more favorable to the interests of their constituents. Nevertheless, as the Supreme Court has stated, "the Act is not intended to serve either party's individual interest, but to foster in a neutral manner a system in which the conflict between these interest may be resolved." First National Maintenance Corp. v. N.L.R.B., 452 U.S. 666, 680-81, 101 S.Ct. 2573, 2582, 69 L.Ed.2d 318 (1981). Inasmuch as Borden's unilateral actions directly conflicted with the overarching objectives of the National Labor Relations Act of promotion and protection of employee free choice and labor relations stability, N.L.R.B. v. Viola Industries-Elevator Division, 979 F.2d at 1395 (10th Cir.1992), we find that there is a strong statutory interest in applying the Board's ruling to Borden in the present case (factor five).
 
 
 66
 Having balanced the relevant factors, we conclude that the Board's rule conforms with well-recognized principles of labor law, and that its impact does not discriminate between the parties to this litigation. Consequently, application of the Board's ruling to Borden is reasonable under the present circumstances.
 
 V
 
 67
 Borden argues in the alternative that it lawfully implemented the Farmer Jack terms of employment in the course of good-faith bargaining after impasse. In particular, Borden alleges that after March 1988, both parties maintained their bargaining positions and that negotiations were deadlocked.
 
 
 68
 The Union claims that the Board erroneously found that Borden had negotiated in good faith over the closure of the Meadow Gold facility, and that the Union had consented to the application of the Borman CBA to the Farmer Jack facility prior to consolidation. Because a finding of good-faith negotiations is a pre-requisite to a finding of impasse, we will discuss the Union's contentions first.
 
 A.
 
 69
 Good-faith negotiations demand that the parties "enter into discussions with an open mind and a sincere intention to reach an agreement consistent with the respective rights of the parties." United Steelworkers of America v. N.L.R.B., 983 F.2d at 245 (D.C.Cir.1993). "While parties to a negotiation are 'not required to make concessions or to yield any position fairly maintained,' 'rigid adherence to disadvantageous proposals may provide a basis for inferring bad faith' " Teamsters Local Union No. 515 v. N.L.R.B., 906 F.2d 719, 726 (D.C.Cir.1990) (citing cases) (emphasis in the original). The Board's determination of whether a party has negotiated in good faith should be based on the "totality of the circumstances," N.L.R.B. v. Schwab Foods, Inc., 858 F.2d 1285, 1292 (7th Cir.1988) and will not be upset if supported by substantial evidence. Albion Corp. v. N.L.R.B., 682 F.2d 874, 876 (10th Cir.1982).
 
 
 70
 The ALJ's opinion scrupulously delineated the course of negotiations between Borden and the Union. Quite clearly, the negotiations focused on the Union's desire to save the worker-friendly terms of the Meadow Gold CBA, and Borden's desire to maintain and continue the economically favorable terms of the Borman CBA. The ALJ found that while Borden was willing to accede to the Union's proposals regarding dovetailing of seniority, it nevertheless tried to preserve the favorable economic terms of the Borman contract. It sought to do so by offering employees one-time payments in place of concrete wage increases.
 
 
 71
 The parties met on numerous occasions to discuss a new CBA and terms for transferring the Meadow Gold employees.[4] By all accounts, the bargaining was resolute. Nevertheless, a party is not obligated to make concessions nor yield any position fairly maintained. Borden was entitled to insist on the favorable terms of the Borman contract. Considering the totality of the circumstances, we hold that the ALJ's finding, affirmed by the Board, that Borden negotiated with the Union in good faith, was supported by substantial evidence.
 
 B.
 
 72
 This brings us to Borden's contention that negotiations had reached an impasse. As a matter of law, an employer has the right to implement all or part of its final offer with respect to a mandatory subject of bargaining upon an impasse in negotiations. Colorado-Ute Electric Association, Inc. v. N.L.R.B., 939 F.2d 1392, 1404 (10th Cir.1991). An impasse occurs where the parties, after good-faith negotiations, have exhausted all prospects of concluding an agreement. Intermountain Rural Electric Association v. N.L.R.B., 984 F.2d at 1569 (10th Cir.1993). The Board's decision that an impasse does or does not exist is a question of fact that will not be upset if supported by substantial evidence. Id. at 1570; United Steelworkers of America v. N.L.R.B., 983 F.2d at 246 (D.C.Cir.1993).
 
 1.
 
 73
 The requirement that a genuine impasse precede unilateral action can be waived by the union, as long as the waiver is expressed clearly and unmistakably. Intermountain Rural Electric Association v. N.L.R.B., 984 F.2d at 1566-67 (10th Cir.1993). The Board's decision that the Union has waived its rights is a question of fact that will be upheld if supported by substantial evidence in the record. Id.
 
 
 74
 The Union's letter to Borden of November 12, 1988,[5] was reasonably interpreted by the ALJ as a request by the Union that Borden not alter the Farmer Jack terms and conditions of employment. The evidence also supports the ALJ's finding that the Union never clearly revoked this waiver. The ALJ's determination with respect to waiver was supported by substantial evidence and will be upheld.
 
 2.
 
 75
 Nevertheless, the Union's waiver applied only to the Farmer Jack employees, not to the transferred Meadow Gold employees. That is, Borden could not unilaterally apply the Farmer Jack CBA to the transferred Meadow Gold employees, absent an impasse in negotiations, simply because the Union consented to its application to the original Farmer Jack employees. Therefore, Borden still must establish that it negotiated to impasse with the Union over the terms and conditions of employment of the transferred Meadow Gold employees prior to instituting its last offer.
 
 
 76
 The ALJ found that an impasse in negotiations did not exist because Borden's "implementation of the [Farmer Jack] contract was a course of conduct undertaken from the time of its acquisition of the [Farmer Jack] facility and was not initiated after some later argued impasse in bargaining." Evidence presented by the parties bears out the ALJ's finding. The record clearly shows that Borden consistently claimed that it had "bought" the Borman contract along with the Farmer Jack plant. Borden immediately implemented the terms of the Borman CBA with respect to the Farmer Jack employees. Upon its consolidation of the Meadow Gold and the Farmer Jack facilities, Borden claimed that the Borman CBA was equally applicable to the transferred Meadow Gold employees. It proceeded to apply the terms of the Borman CBA to those employees as well.
 
 
 77
 In addition, the ALJ found that even if an impasse had existed, Borden did not, in fact, implement its last offer, or preserve the status quo, with respect to the "transferred" and laid-off Meadow Gold employees. The ALJ noted that the "transferees" carried no seniority and received no credit for Meadow Gold employment. Thus, they were denied specific benefits of transfer which they could have received if Borden's last offer had been implemented. Consequently, the ALJ's determination, affirmed by the Board, that a bona fide impasse did not exist, was not clearly erroneous and will be upheld.
 
 C.
 
 78
 Since we agree with the Board that Borden failed to justify its application of the Borman contract to the Meadow Gold employees, we also will affirm the Board's holding that Borden committed an unfair labor practice by constructively discharging those Meadow Gold employees who opted for early retirement over continued employment with reduced benefits at Farmer Jack.
 
 
 79
 The effect of Borden's application of the Borman contract's lower wage structure to the Meadow Gold employees was to unlawfully condition the employees' continued employment on their accepting conditions of employment inferior to those contained in the Meadow Gold CBA. See, e.g., N.L.R.B. v. Tricor Products, Inc., 636 F.2d 266, 271 (10th Cir.1980). When an employee leaves his job as a result of such an unlawful condition, the employee is considered to have been constructively discharged. Id.
 
 VI
 
 80
 Thus, both Borden's and the Union's petitions for review will be denied and the Board's cross-application for enforcement of its July 31, 1992 order will be granted.
 
 
 
 *
 The Honorable Leonard I. Garth, Senior United States Circuit Judge, United States Court of Appeals for the Third Circuit, sitting by designation
 
 
 [1]
 The work force at the Farmer Jack plant as of October 7, 1988 consisted of 35 former Meadow Gold employees, 31 original Farmer Jack employees, and 13 new hires
 
 
 [2]
 Section 8(a) of the National Labor Relations Act, 29 U.S.C. Sec. 158(a), provides in relevant part as follows:
 (a) It shall be an unfair labor practice for an employer--
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization ...;
 (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.
 
 
 [3]
 The Union's consolidated complaint alleged the following:
 (5) On or about March 9, 1988, at [Borden's] Meadow Gold facility, [Borden], acting through Anthony Ward, told employees that it would not transfer any Salt Lake City Meadow Gold employees to the Farmer Jack facility unless the Union would agree that the Farmer Jack contract applied to all employees at that facility [in violation of Sec. 8(a)(1) of the Act].
 (6) On or about September 26, 1988, [Borden] discharged its Meadow Gold employees and rehired certain of these employees as new hires at its Farmer Jack facility [in violation of Secs. 8(a)(1) and (3) of the Act].
 (7) [Borden] engaged in the acts and conduct described above in paragraph 6, because the employees therein joined, supported, or assisted the Union, and engaged in concerted activities for the purpose of collective bargaining or other mutual aid or protection, and in order to discourage employees from engaging in such activities or other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and because the Union would not agree that the Farmer Jack contract applied to all employees at that facility.
 (8) On or about November 12, 1987, and continuing to date, the Union has requested, and is requesting, [Borden] to bargain collectively with it as the exclusive collective-bargaining representative of the employees in the [Meadow Gold and Farmer Jack] Units ... with respect to rates of pay, wages, hours of employment, and other terms and conditions of employment.
 (12) Since on or about November 12, 1987, [Borden] has failed and refused to recognize and bargain collectively with the Union as the exclusive collective bargaining representative of its [Meadow Gold and Farmer Jack] Units ... by the following acts and conduct [in violation of Secs. 8(a)(1) and (5) of the Act]:
 (a) Since on or about November 12, 1987, [Borden] unilaterally implemented the [Borman] collective-bargaining agreement ... at its Farmer Jack facility without having afforded the Union an opportunity to negotiate and bargain as the exclusive representative of [Borden]'s employees in the Farmer Jack Unit.
 (b) On or about September 26, 1988, [Borden] unilaterally changed the terms and conditions of employment of the employees in the Meadow Gold Unit by unilaterally implementing the [Borman] collective-bargaining agreement ... as to those Meadow Gold employees who became employed by [Borden] at its Farmer Jack facility.
 (c) On or about January 27, 1988, [Borden] bypassed the Union and dealt directly with its employees by offering improved wages and benefits to its Salt Lake City Meadow Gold clerical employees if they agreed to work non-union at [Borden's] Farmer Jack facility.
 
 
 [4]
 The Board's ruling that Borden had committed unfair labor practices by meeting directly with the employees does not compel our finding bad faith. We noted in Intermountain Rural Electric Association v. N.L.R.B., 984 F.2d at 1569 (10th Cir.1993), that "[t]here is no presumption that an employer's unfair labor practice automatically precludes the possibility of meaningful negotiations and prevents the parties from reaching good-faith impasse."
 
 
 [5]
 The Union's letter provided as follows:
 It has come to my attention that a sale of the assets of Farmer Jack Cultured Products, Milk & Ice Cream Plants has occurred. It is my further understanding that your company has acquired the full compliment of bargaining unit employees previously under contract with Farmer Jack.
 The purpose of this letter is to request an immediate meeting to negotiate the wages, hours, and working conditions of all employees (all Farmer Jack and Meadow Gold) affected by this sale. Further, this letter is to request that the present Farmer Jack Labor Agreement not be unilaterally altered by your company pending completion of these negotiations.
 I would like to hear from you in the immediate future regarding a convenient day, time, and place to commence these negotiations.